UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JENNIFER MCINNIS, individually and on behalf of her infant children O.S., C.S. (female), and C.S. (male,) <br><br> Plaintiffs, <br><br> -against- <br><br> CITY OF NEW YORK, et al., <br><br> Defendants. | 24-CV-03449 (GHW) (RFT) <br><br> **OPINION & ORDER** |

**ROBYN F. TARNOFSKY, United States Magistrate Judge:**

Pending before the Court are the declarations of Plaintiff Jennifer McInnis and Plaintiffs'

attorney Mara Fleder on behalf of McInnis's infant children, O.S., C.S. (female), and C.S. (male)

(O.S., C.S., and C.S. are, together, the "Infant Plaintiffs"), in support of a proposed infant

compromise order ("Proposed Order") to settle Plaintiffs' claims for alleged violation of

Plaintiffs' Fourth and Fourteenth Amendment rights against Defendants City of New York and

Treasure Pray. (*See* ECF 117, Proposed Order.)[1] The claims arise out of the removal of O.S. from

his school and from McInnis' care on October 28, 2022 following a report of child neglect, and

the seizure and questioning of C.S. and C.S. without McInnis' consent in connection with the

investigation of the child neglect report. For the reasons set forth below, the Proposed Order is

approved without a hearing.[2]

---

[1]    Plaintiffs have not settled their claims against Defendants Leah Bralow and Rutmi
Goradia, and Plaintiffs do not seek to terminate the matter as to those non-settling Defendants.
Plaintiffs filed a voluntarily dismissal of Defendant Nyasha Beepot on May 19, 2025. (*See* ECF
113, Stip. of Voluntary Dismissal.)

[2]    The parties to the settlement have consented to my jurisdiction for purposes of
considering the Proposed Order, and Judge Gregory H. Woods approved their consent. (*See* ECF
121; ECF 122.)

**FACTUAL BACKGROUND**

McInnis, a resident of New York City, is the mother of O.S., who was born around 2011;

O.S. has a diagnosis of autism spectrum disorder and has struggled with behavioral issues and

impulse control. (*See* ECF 1, Compl. ¶¶ 7-8, 20-21.) C.S. (female) and C.S. (male) are the

younger siblings of O.S. and were born around 2015. (*See id*. ¶ 20.) At the time of the events

underlying this case, McInnis, the Infant Plaintiffs, and two of McInnis' adult children, James

Taylor and a daughter lived together in an apartment in the Bronx. (*See id.* ¶ 19.)

On the morning of October 28, 2022, McInnis was trying to get the Infant Plaintiffs ready

for school, but O.S. was playing a video game and refusing to cooperate. McInnis told O.S. to

turn the video game off, but he refused. Taylor took the game from O.S. (*See id.* ¶¶ 29-32, 35.)

O.S. ran out of the apartment, down four flights of stairs, and out of the building. McInnis and

Taylor ran after O.S., chasing O.S. as he ran towards a busy street. McInnis and Taylor grabbed

O.S. as O.S. was about to run into traffic and pulled O.S. back to safety. Taylor accidentally

scratched the right side of O.S.'s neck when Taylor grabbed O.S. (*See id.* ¶¶ 36-42.) McInnis

subsequently walked O.S. to school. (*See* ¶¶ 46-47.)

At school, O.S. told someone that his adult brother had beaten him up because of his

misbehavior in music class; O.S. claimed that Taylor had punched him in the stomach and back,

slapped and punched him, put his foot on O.S.'s head, banged him into the wall, punched him

in the nose, and choked him until he could not breathe. O.S. said his mother had hit him three

times with a boot and told him not to get in trouble at school. (*See id.* ¶¶ 48-51.)

Avery Spearman, an employee of ACS, received a report of child neglect from O.S.'s

school and told Defendant Pray, the assigned ACS caseworker, to travel to O.S.'s school and to

get permission from a parent or guardian before transporting O.S. anywhere. Upon arriving at O.S.'s school, Pray immediately took O.S. to St. Barnabas Hospital for an examination, without obtaining permission from O.S.'s parent or guardian. (*See id.* ¶¶ 52-56.)

McInnis received a call from Pray, who informed her that O.S. was at St. Barnabas Hospital and that she could come meet them there. McInnis immediately went to the hospital. O.S.'s medical records from his visit to St. Barnabas Hospital reflect that Nyasha Beepot, a registered nurse at St. Barnabas Hospital, took O.S.'s vitals; when he arrived at the hospital, he appeared playful and smiling, and he said that no one had physically hurt or threatened him. (*See id.* ¶¶ 70-74.)

Defendants Dr. Leah Bralow, an attending physician at St. Barnabas Hospital, and resident physician Dr. Rutmi Goradia were the doctors attending to O.S. They examined O.S.'s nose and detected no signs of trauma, bleeding, or swelling. McInnis explained to Pray what had happened that morning and how O.S.'s neck been scratched. O.S. was kept at the hospital for several hours. Bralow informed McInnis that O.S.'s whole body had been examined for signs of injury and trauma and that his only injury was the scratch on the right side of his neck. Bralow questioned O.S. about the alleged assault, and he told her that Taylor had choked him and beaten him and that he hurt everywhere. He claimed that his mother was in the bathroom at the time and that he did not scream for help. Bralow observed that O.S. frequently changed his story and was an unreliable narrator. She spoke to McInnis, who explained how O.S. had run out of the house and attempted to run into the street after his video game had been confiscated how she and Taylor had grabbed to protect him from oncoming traffic. Bralow noted that O.S. frequently asked about getting back his video game. Bralow found that there

3

were no visible injuries consistent with O.S.'s story and that the abrasion on O.S.'s neck appeared consistent with McInnis's account. After several hours, McInnis was cleared to take O.S. home. (*See id.* ¶¶ 81-92.)

Pray informed McInnis that she would be making a home visit that evening. When Pray arrived, she told McInnis that McInnis was required to let Pray do so, even though Pray did not have a court order or warrant authorizing her to enter. Pray searched the home, which was tidy and without any observed dangers and had appropriate food for the family. Pray spoke to Taylor, who reiterated his version of what had happened that morning and denied ever hitting or abusing any of his siblings. Pray also spoke to the seven-year-old twins for about 15 minutes in the bedroom with the door closed, without having asked McInnis's permission; Pray also examined the twins' bodies outside of McInnis's presence and without permission. Both twins were free of marks and bruises and appropriately dressed. Both twins provided accounts of the events of that morning that confirmed the accounts given by McInnis and Taylor. Both twins told Pray that no one hit O.S. C.S. (female) added that O.S. frequently told stories that were not true. After questioning the children, Pray left, telling McInnis only that she would return. (*See id.* ¶¶ 93-117.)

Pray never did return. O.S.'s case was transferred from Pray to another ACS caseworker, Jordan Mews. On several occasions, Mews called McInnis, saying he was going to conduct a home visit, but then did not appear. Mews only visited McInnis's home after she told him she would meet him at the field office. Mews appeared at McInnis's home on December 13, 2022 and spoke to McInnis about O.S.'s allegations. Mews also spoke with the twins, who said that they were never physically disciplined. On December 14, 2022, Mews called Taylor and asked

him about the allegations. On December 20, 2022, Mews visited O.S. at his school and spoke to

him about the allegations; O.S. claimed he had not run into the street and that the incident had

taken place in his home. O.S. also said he felt safe in his home and did not want his brother to

be arrested. On December 20, 2022, Mews spoke with the social worker at O.S.'s school, who

said that the school took everything O.S. said with a grain of salt. (*See id.* ¶¶ 118-32.)

Sixty days after the child neglect report had been made, McInnis was informed that the

report had been marked unfounded and that the investigation had been terminated. (*See id.* ¶¶

136-37.)

## PROCEDURAL HISTORY

On May 3, 2024, McInnis filed this action against the City of New York (the "City"), the

City Administration for Children's Services ("ACS"), two ACS employees (Pray and Mews), and

three employees of St. Barnabas Hospital (Beepot, Bralow, and Goradia), alleging violation of

her and the Infant Plaintiffs' rights under the Fourth and Fourteenth Amendments. (*See* ECF 1,

Compl. ¶¶ 1-2.)[3] On May 8, 2024, Judge Gregory H. Woods referred the matter to Magistrate

Judge Valerie Figueredo for general pretrial supervision and dispositive motions. (*See* ECF 27,

Order of Ref.) On May 9, 2024, the referral was reassigned to me.

On June 4, 2024, answers to the complaint were filed by Beepot (ECF 36), Bralow (ECF

45), and Goradia (ECF 54). On August 15, 2024, the City and Pray filed their answer (ECF 71). On

August 16, 2024, Plaintiffs voluntarily dismissed their claims against Mews. (*See* ECF 72, 73, Not.

---

[3]     ACS was not a proper defendant; any claims against ACS must be brought against the
City. *See Wright v. Administration of Child Services*, No. 23-CV-10381 (LTS), 2024 WL 622280, at
*2 (S.D.N.Y. Feb. 14, 2024).

of Voluntary Dismissal.) Plaintiffs filed a voluntarily dismissal of Beepot on May 19, 2025. (*See* ECF 113, Stip. of Voluntary Dismissal.)

The parties' proposed case management plan was entered on August 15, 2024 (ECF 70). The deadline for completing discovery was May 7, 2025. (*See* ECF 80, Order.)

On May 5, 2025, Plaintiffs submitted their first proposed infant compromise order (ECF 97), their counsel's first declaration in support of the Proposed Order (ECF 98, First Declaration of Mara Fleder in Support ("First Fleder Decl.")), and McInnis's First Declaration in Support of the Proposed Order ("First McInnis Decl.") (ECF 99). On May 9, 2025, I issued an order directing Plaintiffs to make supplemental filings in support of the Proposed Order (ECF 100.)

McInnis timely filed a second declaration in support of the Proposed Order ("Second McInnis Decl.") (ECF 119); Fleder also timely filed a second declaration in support of the Proposed Order ("Second Fleder Decl.") (ECF 118). Plaintiffs also filed the Proposed Order (ECF 117).

## LEGAL STANDARDS INVOLVING INFANT COMPROMISES

### I.    Procedural Requirements

In this District, Local Rule 83.2(a)(1) requires that:

[a]n action by or on behalf of an infant or incompetent shall not be settled or compromised . . . without leave of the Court embodied in an order, judgment, or decree. The proceeding upon an application to settle or compromise such an action must conform, as much as possible, to the New York State statutes and rules, but the court, for cause shown, may dispense with any New York State requirement.

S.D.N.Y. Loc. R. 83.2(a)(1).

New York Civil Practice Law & Rules ("CPLR") 1208 sets specific procedures for approving settlements and compromises of an infant's claim. The Court must consider an affidavit of the infant's representative that discusses (1) the representative's identity, residence, and relationship to the infant; (2) the name, age, and residence of the infant; (3) the circumstances that gave rise to the claim; (4) the nature and extent of the infant's injuries or damages; (5) the terms of the settlement; (6) the facts surrounding the settlement; (7) whether other reimbursement has been received; and (8) whether the infant's representative or family members have also made claims, and if so, more information about those claims. *See* CPLR 1208(a).[4] The Court must also consider the affidavit of the infant's attorney, which must state: (1) the reason the attorney recommends the settlement; (2) that she is acting in the interests of the infant; and (3) what services she has rendered. *See* CPLR 1208(b). Counsel must include medical and hospital reports in settlements of personal injury claims. *See* CPLR 1208(c).

CPLR 1208(d) requires that the moving party, the infant, and his attorney appear "before the court unless attendance is excused for good cause." The infant's appearance is "the long-time practice of the court[s]." *Bittner v. Motor Vehicle Acc. Indemnification Corp.*, 257 N.Y.S.2d 521, 523 (Sup. Ct. 1965). "The appearance of the infant serves at least two purposes. First, an appearance may permit the Court to determine the extent of any injuries suffered. Second, appearance by the infants permits the Court to determine their position with respect to the settlement, which is a relevant consideration even given their minority." *Southerland v. City of New York*, No. 99-CV-3329 (CPS), 2006 WL 2224432, at *3 (E.D.N.Y. Aug. 2, 2006). New

---

[4]    Unless otherwise indicated, this opinion and order omits internal quotation marks, citations, and emphases from quoted text.

York State courts have established the "good cause" standard for excusing the hearing as "consider[ing] whether the infant's appearance is necessary for a proper determination of settlement, and whether it would constitute a particular or unnecessary hardship if attendance is required." *Linda J. v. Wharton*, 594 N.Y.S.2d 971, 972 (Queens Cty. Civ. Ct. 1992). *Bermudez* set out six factors for examining the good cause standard: "1. The nature and extent of the injuries, 2. The permanency of the injuries, 3. The degree of recovery attested to by a physician, 4. The age of the infant, 5. The amount of the settlement in relation to the injuries sustained, [and] 6. The nature of the hardship involved in having the infant appear in court." *Bermudez v. Spagnoletti*, 803 N.Y.S.2d 17, 17 (Kings Cty. Civ. Ct. 2005). Federal courts also look to these six factors in assessing whether to forgo a hearing for "good cause." *See Allen v. Robert's Am. Gourmet Food, Inc*., No. 07-CV-2661 (NGG) (ETB), 2009 WL 2951980, at *9 (E.D.N.Y. Sept. 8, 2009) (citing *Wharton* and *Bermudez*); *Estate of Doe v. New York City Dep't of Soc. Servs*., 93 Civ. 8385 (JFK) (MHD), 1995 WL 619864, at *2 n.2 (S.D.N.Y. Oct. 23, 1995) (stating that no formal hearing was required and distinguishing the conclusion in *Wharton* that a hearing was necessary).

## II.    Substantive Requirements

In determining whether an infant compromise should be approved, "the Court's role is to exercise the most jealous care that no injustice be done to the infant." *Southerland v. City of New York,* No. CV-99-3329 (CPS), 2006 WL 2224432, at *2 (E.D.N.Y. Aug. 2, 2006). "Consistent with the applicable New York State statutes and rules, the analysis in this jurisdiction centers on whether: (1) the best interests of the infant are protected by the terms and conditions of the proposed settlement; and (2) the proposed settlement, including any legal fees and expenses to

be paid, as part of the proposal, are fair and reasonable." *Orlander v. McKnight,* No. 12-CV-4745 (HBP), 2013 WL 4400537, at *3 (S.D.N.Y. Aug. 15, 2013); N.Y. Jud. L. § 474; CPLR §§ 1205-08; *see also Edionwe v. Hussain,* 777 N.Y.S.2d 520, 522 (2d Dep't 2004) (holding that the required analysis is whether settlement is "fair and reasonable and in the infant plaintiff's best interests"). "There is no bright-line test for concluding that a particular settlement is fair." *Sch. for Language & Commc'n Dev. v. New York State Dep't of Educ.,* No. 02-CV-0269 (JS) (JO), 2010 WL 1740416, at *2 (E.D.N.Y. Apr. 7, 2010), *adopted by* 2010 WL 1752183 (E.D.N.Y. Apr. 28, 2010). The Second Circuit has stated that "Rule 83.2 is hardly a rigid obligation imposed on district courts." *Neilson v. Colgate-Palmolive Co.,* 199 F.3d 642, 655 (2d Cir. 1999). Thus, "[d]istrict courts have broad discretion when conducting an infant compromise hearing." *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 89 (2d Cir. 2010).

Courts in this District approve proposed infant compromises only when those agreements are "fair, reasonable, and adequate," based on a comparison of "the terms of the compromise with the likely rewards of litigation." *Neilson,* 199 F.3d at 654. In making this determination, a court should "form an educated estimate of the complexity, expense, and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Martegani v. Cirrus Design Corp.,* 687 F. Supp. 2d 373, 377 (S.D.N.Y. 2010). These other factors include: the stage of the proceedings and the amount of discovery completed; the risks of establishing liability; the risks of establishing damages; the ability of the defendants to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery; and the range of

reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Allstate Ins. Co. v. Williams,* No. 04-CV-4575 (CLP), 2006 WL 2711538, at *2 (E.D.N.Y. Sept. 21, 2006).

A settlement is presumptively fair and reasonable if "(i) the settlement is not collusive but was reached after arm's length negotiation; (ii) the proponents have counsel experienced in similar cases; [and] (iii) there has been sufficient discovery to enable counsel to act intelligently." *T.H. v. New York City Dep't of Educ.,* 99 F. Supp. 3d 394, 395-97 (S.D.N.Y. 2015). Also, it is well-settled that a compromise negotiated by an infant's natural guardian is presumptively fair and in the best interests of the child. *See, e.g., Sch. for Language & Commc'n Dev.,* 2010 WL 1740416, at *3.

## III.    Attorneys' Fees

"When approving an infant's compromise, the court [also] has an obligation to approve the reasonableness of attorney's fees." *Sanchez v. MTV Networks,* 10-CV-7854 (TPG), 2012 WL 2094047, at *2 (S.D.N.Y. June 11, 2012); *see also Orlander*, 2013 WL 4400537, at *6. The inquiry should focus on whether there was "suitable compensation for the attorney for his service . . . [on] behalf of the . . . infant." *Baez v. City of New York,* No. 09-CV-2635 (RRM) (JO), 2010 WL 1992537, at *3 (E.D.N.Y. Apr. 21, 2010). The agreement to a proposed attorney fee by the guardian of an infant plaintiff is not sufficient to approve the fee, because "the fee must be fixed by the court and any agreement of the guardian is advisory only." *Werner v. Levine,* 276 N.Y.S.2d 269, 271 (Nassau Cty. Sup. Ct. 1967); *see also Baez,* 2010 WL 1992537, at *3 (agreements on fees "serve only to guide the court in making a determination committed to its sound discretion").

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany,* 522 F.3d 182, 186 (2d Cir. 2008) (*quoting Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983)). The hourly rates should be "what a reasonable, paying client would be willing to pay," *Arbor Hill Concerned Citizens,* 522 F.3d at 184, and should be "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson,* 465 U.S. 886, 895 n.11 (1984). The Second Circuit has identified the following factors that a court should consider in determining what a reasonable client would be willing to pay:

> the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether the attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

*Arbor Hill Concerned Citizens,* 522 F.3d at 184.

"[T]he fee applicant has the burden of showing by satisfactory evidence – in addition to the attorney's own affidavits – that the requested hourly rates are the prevailing market rates." *Farbotko v. Clinton Cnty. of New York,* 433 F.3d 204, 209 (2005) (*quoting Blum,* 465 U.S. at 896 n.11). That evidence must include billing records "from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required;

where adequate contemporaneous records have not been kept the court should not award the full amount requested." *Martegani,* 687 F. Supp. 2d at 378.

**DISCUSSION**

I.    **The Required Filings Have Been Made**

McInnis is the representative of O.S., C.S. (female), and C.S. (male); McInnis submitted declarations that discuss the eight factors set out in CPLR 1208(a). She states her identity and states her relationship to the infant plaintiffs. (*See* ECF 99, First McInnis Decl. ¶ 1.) McInnis also sets out the terms of the settlement: specifically, the City and Pray have agreed to pay $100,000.00 to settle the claims against them, with $32,833.34 going to her, $32,833.33 going to her minor child O.S., $500.00 going to her minor child C.S. (female), $500.00 going to her minor child C.S. (male), and $33,333.33 going to counsel. (*See id.* ¶ 3.) McInnis indicates that she will deposit O.S.'s funds in an interest-bearing account, to be released to O.S. over time after he reaches the age of 18. (*See id.* ¶ 4.)

McInnis also states the ages and residence of the Infant Plaintiffs (*see* ECF 119, Second McInnis Decl. ¶¶ 2-5); the circumstances that gave rise to the claim and the nature and extent of the infants' injuries (*see id.* ¶¶ 6-13); the facts surrounding the settlement (*see id.* ¶¶ 15-17); and that no other reimbursement has been received in connection with the circumstances surrounding the claims and no other claims have been made (*see id.* ¶¶ 24-27).

Fleder has submitted declarations explaining the reasons she recommends the settlement (*see* ECF 118, Second Fleder Decl. ¶¶ 14-17); describing the services she has rendered (*see id.* ¶ 6); and stating that she is acting in the interests of the infants (*see* ECF 98,

First Fleder Decl. ¶ 9). Her second declaration attached contemporaneous billing records. (*See* ECF 118, Second Fleder Decl. Ex. C.)

**II.     There Is Good Cause To Forgo a Hearing at Which
         McInnis, the Infants, and Counsel Must Appear**

McInnis explains that requiring the Infant Plaintiffs to attend a hearing would be overwhelming for them and, in the case of O.S., could trigger a behavioral outburst. (*See* ECF 119, Second McInnis Decl. ¶ 28.) I find that avoiding distress to the Infant Plaintiff constitutes the requisite good cause for them not to be required to attend a hearing. *See Wharton*, 594 N.Y.S.2d at 972.

**III.    The Proposed Infant Compromise Is Fair, Reasonable, and Adequate**

A.      <u>The Terms of the Agreement</u>

The Infant Plaintiffs' parent is a proponent of the settlement, and I have not seen any indication to rebut the presumption that a settlement negotiated by an infant's natural guardian is fair and in the best interests of the child. *See, e.g., Sch. for Language & Commc'n Dev.,* 2010 WL 1740416, at *3. To the contrary, the settlement here bears indicia of being fair and reasonable: it is the product of arms'-length negotiation (*see* ECF 118, Second Fleder Decl. ¶¶ 7-8); counsel has experience in similar cases, and avers that this settlement compares favorably to settlements in similar cases (*see id.* ¶¶ 14-17); and the settlement occurred after paper discovery was substantially complete (*see id.* ¶ 7), which is sufficient for the parties to make an intelligent evaluation of the terms. *See T.H.,* 99 F. Supp. at 395-97. I conclude that the terms of the settlement are "fair, reasonable, and adequate," based on a comparison of "the terms of the compromise with the likely rewards of litigation." *Neilson,* 199 F.3d at 654.

B.    <u>Attorneys' Fees</u>

Plaintiffs have met the burden of showing by satisfactory evidence that the requested fees are reasonable, *see Farbotko,* 433 F.3d at 209. Contingency awards of one-third of the plaintiff's recovery are common in similar cases in this jurisdiction. *See Orlander*, 2013 WL 4400537, at *8. The billing records reflect that two attorneys worked on this matter – Fleder, who is an associate, spent 71.57 hours and Joel Wertheimer, who is a partner, spent 1.3 hours. (*See* ECF 118, Second Fleder Decl. Ex. C.) Fleder's hourly billing rate is $400 and Wertheimer's is $600. These billing rates fall within the range of rates charged by civil rights lawyers of similar experience in this District. *See Campbell v. City of New York,* No. 15-CV-2088 (PAE), 2015 WL 7019831, at *5 n.1 (S.D.N.Y. Nov. 10, 2015) (finding experienced attorney rates range from $250 to $600 and rates for associates range from $200 to $350, with average rates increasing over time). Likewise, the amount of time spent on this matter appears reasonable. *See Orlander,* 2013 WL 4400537, at *8 (finding 107 hours to be reasonable to take a case of this type partway through discovery).

<b><u>CONCLUSION</u></b>

For the reasons set forth above, the Proposed Order is approved without a hearing. The Clerk of Court is respectfully requested to terminate ECF 120.

DATED:  June 3, 2025
         New York, New York

SO ORDERED.

**ROBYN F. TARNOFSKY**
United States Magistrate Judge