UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Jennifer McInnis, individually and on behalf of her
infant child O.S.,

Plaintiffs,

— against —

City of New York, Treasure Pray, Leah Bralow, and
Rutmi Goradia,

Defendants.

---

Index No. 24-cv-3449 (GHW) (RFT)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Submitted by:*

WERTHEIMER FLEDER LLP
Mara Fleder, Esq.
Joel Wertheimer Esq.
*Attorneys for Plaintiff*
14 Wall Street, Ste 4C
New York, New York 10005
(646) 344-4212
mara@wfllp.com

## TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

FACTS ...................................................................................................................... 2

LEGAL ARGUMENT.............................................................................................. 7

A.   Doctors Engage in State Action When They Examine Children Without Parental Consent, Court Authorization, or Medical Necessity at the Request of Child Welfare Caseworkers....... 7

1)   Medically unnecessary exams of minors, without consent or authorization, violate the Fourth and Fourteenth Amendments, unless exigent circumstances exist. ................................ 7

2)   Doctors engage in state action when they conduct investigatory, rather than medically indicated, exams of minors at the state's behest. ...................................................................... 10

B.   Whether Defendants Goradia and Bralow Engaged in State Action by Conducting Unauthorized Physical Examinations of O.S. For Investigative Purposes Depends upon a Critical Material Fact in Dispute............................................................................................... 13

C.   Whether O.S. Was Suffering from a Medical Emergency That Justified Being Physically Examined Before Parental Permission or a Court Order Could Be Obtained Is Material Fact Also in Dispute. .................................................................................................................... 18

D.   If Conducted for Investigative Purposes, in the Absence of An Emergency, The Physical Examinations of O.S. Constitute Unreasonable Searches in Violation of His Fourth Amendment Rights and His Mother's Fourteenth Amendment Rights.................................... 24

E.   EMTALA Does Not Permit Medical Staff to Bypass Their Obligations Under *Tenenbaum* and New York Public Health Law Requiring Consent. ........................................ 26

CONCLUSION....................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Armstrong v. Brookdale Univ. Hosp & Med. Ctr.*, 2002 U.S. Dist. LEXIS 29224 (E.D.N.Y 2002) ................................................................................................................... 2, 11, 12

*Armstrong v. Brookdale Univ. Hosp & Med. Ctr.*, 425 F.3d 126 (2d Cir. 2005) ........................ 25

*Chayo v. Kaladjian*, 844 F. Supp. 163 (S.D.N.Y. 1994) ................................................................ 8

*Denes Q. v. Caesar*, 2011 U.S.DIST. LEXIS 106999 (E.D.N.Y Sept. 21, 2011) ....................... 12

Doe v. Renfrow, 451 U.S. 1022 (1981) ........................................................................................... 9

*Doe v. Renfrow*, 631 F.2d 91 (7th Cir.1980) ................................................................................. 9

*Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54 (2d Cir.1987) ............................ 15

*Estiverne v. Esernio Jenssen*, 581 F. Supp.2d 335 (E.D.N.Y. Jul. 31, 2008) ............................. 10

*Evans v. Newton*, 382 U.S. 296 (1966) .......................................................................................... 7

*F.A.A. v. Landy*, 705 F.2d 624 (2d Cir. 1983) ............................................................................. 16

*Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76 (S.D.N.Y. 2020) ............................ 17

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................................................... 21

*Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789 (2d Cir. 1999) ........................................ 26

*Johnson v. City of New York*, 2021 U.S. Dist. LEXIS 159482 (S.D.N.Y. Aug. 23, 2021) 2, 11, 12, 24

*Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006 (2d Cir. 1986) ............................................. 16

*Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000) ..................................................... 10, 11, 13, 14

*L.B. v. City of New York*, 2025 U.S. LEXIS 45105 (E.D.N.Y. March 12, 2025) ........................ 10

*Madden v. Abate*, 800 F.Supp.2d 604 (D. Vt. 2011) ................................................................... 22

*McLoughlin v. Rensselaer County Dep't of Soc. Servs., 2019 U.S. Dist. LEXIS 137120* (N.D.N.Y. Aug. 14, 2019) .................................................................................................... 2, 7, 13, 17

*Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556 (E.D.N.Y. 1999) ............................... 16

*O'Bert v. Vargo*, 331 F.3d 29 (2d Cir. 2003) ............................................................................. 22

*Perez v. Sugarman*, 499 F.2d 761 (2d Cir. 1974) ...................................................................... 7

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ..................................................................... 8, 25

*Robison v. Via*, 821 F.2d 913 (2d Cir. 1987) ............................................................................ 19

*Santosky v. Kramer*, 455 U.S. 753 (1982) ................................................................................. 8

*Scott v. Henrich*, 39 F.3d 912 (7th Cir. 1994) .......................................................................... 22

*Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639 (2d Cir. 1988) .......................................... 16

*Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999) ....................................................... passim

*Tenenbaum v. Williams*, 862 F. Supp. 962 (E.D.N.Y. 1994) ............................................. 8, 9, 24

*van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863 (2d Cir.1990) ........... passim

*Velez v. Town of Stratford*, No. 3:18-CV-1053 (VAB), 2020 U.S. Dist. LEXIS 39184 (D. Conn.
   Mar. 6, 2020) ...................................................................................................................... 15

*Walston v. City of New York*, 2024 U.S. Dist. LEXIS 41409 (S.D.N.Y. March 7, 2024) ........... 14

*Weller v. NYU Langone Health Sys.*, 2025 U.S. Dist. LEXIS 124171 (E.D.N.Y. June 30, 2025) 26

*Wright v. Stephens*, 2025 N.Y. App. Div. LEXIS 3517 (4th Dept. June 6, 2025) ...................... 26

**Statutes**

42 U.S.C. § 1395dd ................................................................................................................ 26, 27

42 U.S.C. § 1983 ..................................................................................................................... 7, 8

Fam Ct. A. § 1021 ...................................................................................................................... 18

Fam. Ct. A. § 1022 ..................................................................................................................... 18

Fed. R. Evid. ............................................................................................................................... 16

N.Y. Pub. Health Law § 2504(4) .......................................................................................... 17, 26

**Other Authorities**

26 U.S.F.L. Rev. 1 ........................................................................................................................ 9

## PRELIMINARY STATEMENT

Defendants' Motion for Summary Judgment should be denied because Defendants, medical doctors employed at St. Barnabas Hospital, were engaged in state action when they conducted medically unnecessary physical examinations of O.S. on October 28, 2022, without parental permission or court order. Rather than treat any emergent medical need, these physical examinations were done to investigate allegations of child abuse or neglect following a false report that O.S. made at school that day. Although O.S. claimed that his adult brother and mother had beaten him all over his body before school that morning, by the time he arrived at the hospital after spending the entire day at school, he was playful, smiling, alert, ambulatory, and medically stable. The only visible injuries noted to O.S.'s body were superficial bruises on his neck that did not require medical treatment. Nonetheless, when an Administration for Children's Services ("ACS") caseworker requested that O.S. be physically examined to see if he had injuries consistent with the report he had made, Defendants Goradia and Bralow did so without making any effort to secure parental permission or court authorization.

Conducting physical examinations of children for the purpose of investigating allegations of child abuse or neglect without parental permission or court order constitutes a warrantless search that violates the child's rights under the Fourth Amendment and the parent's rights under the Fourteenth Amendment to give or deny consent before such searches are conducted. *See Tenenbaum v. Williams*, 193 F.3d 581, 599 (2d Cir. 1999). Though medical personnel ordinarily are not considered state actors subject to Section 1983 lawsuits, when they conduct medically unnecessary examinations of children at the behest of state workers to further investigations of child abuse or neglect – as Defendants did in this case – they engage in state action and are subject to suit. *See e.g., Armstrong v. Brookdale Univ. Hosp & Med. Ctr.*, 2002 U.S. Dist.

1

LEXIS 29224 (E.D.N.Y 2002); *Johnson v. City of New York*, 2021 U.S. Dist. LEXIS 159482, *22-23 (S.D.N.Y. Aug. 23, 2021).

Defendants conducted the examinations at the request of an ACS caseworker to see if O.S. had injuries consistent with allegations of abuse that she was investigating, creating a clear inference that the examinations were conducted for investigative purposes. *McLoughlin v. Rensselaer County Dep't of Soc. Servs., 2019 U.S. Dist. LEXIS 137120*, *25 (N.D.N.Y. Aug. 14, 2019). Additionally, Defendants physically examined O.S. after he had already been assessed at triage to not require any immediate medical treatment. Hospital staff assigned to monitor O.S. between the time he was assessed at triage and the time the physical examinations were conducted noted he was calm, awake, and eating throughout his admission, and not in any acute distress. Indeed, Defendants believed the need for such authorization is dispensed with when a child presents to the hospital in the care of an ACS caseworker. Under the Fourth Amendment's objective reasonableness standard, no reasonable emergency room doctor would have deemed it medically necessary to physically examine O.S. before a court order or parental consent could be obtained under the circumstances.

Because central issues of fact are materially disputed, and those factual determinations are within the exclusive province of the jury, Defendants' Motion must be denied.

## FACTS

On the morning of October 28, 2022, eleven-year-old O.S., a child with autism spectrum disorder, falsely reported to school personnel that he had been beaten by his adult brother and mother before he arrived at school that morning. SUMF ¶¶ 1, 11, 42, 51. Hours after he made the report, Fire Department of New York ("FDNY") personnel transported O.S. from his school

to St. Barnabas Hospital ("SBH"), where he was handed off to an Administration for Children's Services ("ACS"), caseworker, Treasure Pray, who was assigned to investigate the case.  SUMF ¶¶ 11, 12, 15-17.

O.S. arrived at SBH at 3:14 p.m, approximately five hours after the school called in the report, and eight hours after the alleged assault occurred.  SUMF ¶ 15.   When she arrived at the hospital, Ms. Pray spoke to someone at reception, explaining the reason she was there and identified herself as an ACS caseworker.  SUMF ¶ 91.  Though O.S. claimed he had been beaten all over his body that morning, including being punched in the nose, by the time he arrived at SBH that afternoon, he was calm, smiling, and free from any visible injuries – except for superficial marks on his neck.  SUMF ¶¶11, 15-16, 21-22; 92, 96, 106, 110.  Those marks did not require medical treatment.  SUMF ¶ 116-117.  Nonetheless, Ms. Pray believed O.S. needed to be medically assessed to see if he had injuries consistent with O.S.'s allegations.  SUMF ¶ 91.

Ms. Pray was present with O.S. when he was assessed by Nyasha Beepot, an experienced triage nurse, who concluded he was not suffering from any acute physical injuries that required immediate attention.  SUMF ¶ 21-22; 95, 106, 112.  Nurse Beepot found O.S. was awake, alert, verbal, did not have any difficulty breathing, presented with good circulation, and was visibly playful and smiling.  SUMF ¶ 96, 114.  The fact O.S. was noted by Nurse Beepot to be "playful smiling" in her triage assessment was significant as it decreased concern that the child was very sick.  SUMF ¶ 110.

Based on his vital signs, history of his alleged injuries, and his physical presentation, Nurse Beepot assigned O.S. level "3" triage acuity level, which meant that he needed to be seen at some point, but could wait for hours if necessary.  SUMF ¶ 97-98. Nurse Beepot confirmed that the assignment of the level "3" was largely attributable to the fact that O.S. was brought to

3

the emergency room by ACS, which required more hospital resources by virtue of SBH's

elopement precaution policy, rather than O.S.'s physical condition.  She testified: "he didn't fall

under severity 1 or 2 because those are like life threatening, you know, immediate emergent

needs for assessment," but "if you're a child who comes in … with ACS … [you] have to be

under constant observation.  That's – that's what I mean by consider the resources."  SUMF ¶ 99.

After being assessed at triage, O.S. was taken to a curtained off area in the emergency

department, his clothes were taken away from him, and he was given a yellow gown, the color

designated for patients brought to SBH by ACS who are on "elopement precaution."  SUMF ¶¶

23, 100, 104.  He was left there with Ms. Pray and an SBH staff person assigned to continuously

monitor him.  SUMF ¶¶ 100-101.

Defendant Rutmi Goradia, a resident, examined O.S. first.  SUMF ¶¶ 1, 115.  Dr. Leah

Bralow, the attending physician, examined O.S. second.  SUMF ¶¶ 2, 115.  Nothing about O.S.'s

physical condition or presentation changed between the time he was seen at triage and the time

he was examined by Defendants Goradia and Bralow.  SUMF ¶ 110, 111.  The SBH staff

members who were assigned to monitor O.S. throughout his admission observed O.S. to be

awake, calm, and eating; at no point did they observe him agitated, combative, sleeping, restless

or otherwise in distress. SUMF ¶ 101.

Dr. Goradia never provided any medical treatment to O.S.; rather, she examined him to

see if he had any injuries consistent with the allegations of abuse.  SUMF ¶ 77, 112.  Dr. Goradia

testified that when a child is brought to the emergency department by ACS, she takes a history

from the caseworker as to why they brought the child in, which impacts what she looks for in her

examination.  SUMF ¶ 107.  In O.S.'s case, the purpose of his examination was to determine

whether he had any injuries consistent with the allegations of abuse that he had made and to treat

4

such injuries if any, in fact, were present.  SUMF ¶¶ 34-35, 102, 112.  In her physical examination of O.S. Dr. Goradia observed O.S. walk, examined his head, shone a light in his eyes, found his ears were clear, his nose was fine, his neck had a bruise but it was not tender, she listened to his heart and his lungs, felt his stomach, and found he did not have any pain in his back, he was neurologically intact and his skin was warm and dry.  SUMF 113.  Nothing about O.S.'s physical examination was significant or abnormal other than the bruise on his neck. SUMF ¶¶ 115-116.

After Defendant Goradia examined O.S. and found that he had no injuries and did not require any medical treatment, she presented the case to her attending doctor, Defendant Bralow, who then performed *another* physical examination of O.S.  SUMF ¶¶ 38, 45, 103.  Defendant Bralow, like Defendant Goradia, did not provide any medical treatment to O.S. SUMF ¶¶ 35, 115.  Dr. Bralow also confirmed that she examined O.S. to determine if he had injuries consistent with the alleged assault.  SUMF ¶ 103.

No parent or guardian was with O.S. when he arrived at the hospital, and neither Defendant Goradia nor Defendant Bralow made any effort to obtain parental consent before examining him.  SUMF ¶¶16-17, 25-27, 105.  Indeed, Defendants Goradia and Bralow were fully aware that O.S. was brought to the emergency department by ACS and believed that parental consent was unnecessary when a child is brought to the emergency department by a child welfare caseworker.  SUMF ¶¶25, 26, 106, 127.  Defendant Bralow testified that it was never her practice to check to see if consent was on file, and indeed it is "irrelevant if a parent is present."  SUMF ¶¶27-28.  Defendant Goradia stated that when children are brought into the hospital by ACS because of suspected child abuse, "we reserve the right to examine the child without explicit consent."  SUMF ¶ 127.

Although Defendants contend that O.S.'s mother arrived at SBH "during the course of the examination" and "never directed Defendants not to examine O.S.," Ms. McInnis arrived at the hospital after O.S. had already been examined by Defendant Goradia.  SUMF ¶ 108.  Neither ACS nor O.S.'s school informed Ms. McInnis for hours that O.S. had been taken to SBH, and when Ms. Pray finally contacted her, Ms. McInnis went directly to the hospital to be with her son.  By the time Ms. McInnis arrived, the physical examination had already been completed.  SUMF ¶¶ 57, 58, 108, 119.  When she got there, Ms. McInnis found her son wearing only a hospital gown in a room with a SBH staff person.  SUMF ¶ 120.  Ms. Pray then walked in, followed by one of the doctors.  SUMF ¶ 123.  Ms. McInnis asked the doctor what happened to her son and was told that O.S. was at the hospital to be examined because of allegations that he had been beaten.  SUMF ¶ 60, 122.

Dr. Bralow did not know at what point Ms. McInnis arrived at SBH that afternoon and did not know if she spoke with Ms. McInnis separately, but indicated the notes entered in O.S.'s electronic medical records stated Ms. McInnis was present.  SUMF ¶ 43, 124.  Dr. Goradia's record also notes that "mom's at the bedside by the time she saw the patient." SUMF ¶¶ 36, 125.  In her deposition, however, Dr. Goradia, confirmed Ms. McInnis's account that she was not present when Dr. Goradia physically examined O.S.  SUMF ¶ 108.

At the conclusion of the physical examinations, which did not reveal any injuries consistent with the allegations made in the report, O.S. was discharged from SBH and allowed to return home with his mother.  SUMF ¶ 45.  Two months later, the ACS investigation closed with the allegations against Ms. McInnis and O.S.'s adult brother deemed "unfounded." SUMF ¶ 51.

**LEGAL ARGUMENT**

**A. Doctors Engage in State Action When They Examine Children Without Parental Consent, Court Authorization, or Medical Necessity at the Request of Child Welfare Caseworkers.**

Section 1983 provides a cause of action against a person who, acting under color of state law, deprives a plaintiff of a constitutionally protected right.  42 U.S.C. § 1983.  Though private actors are typically not vested with the type of power to act under color of state law, and therefore are not subject to Section 1983 actions, there are times when the private actor's conduct "may become so entwined with governmental policies, or so impregnated with a governmental character as to become" subject to 42 U.S.C. § 1983.  *Perez v. Sugarman*, 499 F.2d 761, 764-65 (2d Cir. 1974) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)).  Private physicians become state actors subject to § 1983 when they effectively act as an arm of the state child welfare agency in ways that are not medically necessary – as when they abet caseworkers' efforts to investigate allegations of abuse by examining children to see if they have injuries consistent with those allegations.  When they conduct such examinations in the absence of parental consent, court order, or medical necessity, doctors engage in state action that violates the Fourth Amendment rights of the children they examine, and the Fourteenth Amendment rights of their parents.

**1) Medically unnecessary exams of minors, without consent or authorization, violate the Fourth and Fourteenth Amendments, unless exigent circumstances exist.**

A "medical procedure cannot be undertaken without parental consent 'for investigative purposes at the behest of state officials' without due process." *McLoughlin v. Rensselaer County Dep't of Soc. Servs., 2019 U.S. Dist. LEXIS 137120*, *25 (N.D.N.Y. Aug. 14, 2019).  In *van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 867 (2d Cir.1990), a seven-month-old child was taken by her mother to a hospital emergency room, where the infant was

diagnosed with a spiral fracture of her right leg. Although the attending physician was hesitant to perform x-rays because of radiation exposure, he did so at the caseworker's request, without parental consent or court authorization. *Id*. at 865. The Second Circuit held:

> The Constitution assures parents that, in the absence of parental consent, x-rays of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances.

*Id*. at 867.

In reaching its decision, the court noted that the "parent's right to the 'care, custody, and management of their child,' though not 'beyond limitation,' includes a significant decision-making role concerning medical procedures sought to be undertaken by state authority upon their children." *Id.* (quoting *Santosky v. Kramer*, 455 U.S. 753 (1982) and *Prince v. Massachusetts*, 321 U.S. 158 (1944)). The *van Emrik* Court continued, "[t]hat interest assumes special significance when the procedures undertaken at the initiative of a state official serve primarily an investigative function; in such circumstances, Fourth Amendment and bodily integrity interests of the child are implicated." *Id.*; *c.f. Chayo v. Kaladjian*, 844 F. Supp. 163, 169 (S.D.N.Y. 1994) (finding *van Emrik* did not apply where x-rays were ordered by a physician, rather than caseworkers, and was done for medical purposes).

The rationale of the *van Emrik* decision, which involved the use of x-rays, has been extended to medical examinations done for the purposes of investigating allegations of abuse. In *Tenenbaum v. Williams*, 862 F. Supp. 962, 973 (E.D.N.Y. 1994), parents of a child who was taken from school and subjected to an invasive physical examination based upon suspicion of parental abuse, filed a § 1983 action against child welfare social workers and the Board of

Education.  The district court denied defendants' motion for summary judgment, finding that the defendants unconstitutionally interfered with the plaintiffs' parental rights by having doctors examine the child for the purposes of investigating claims of child abuse without parental consent.  Although the medical examination of the child did not involve any "physical risk" like x-ray exposure in *van Emrik*, the district court noted that "[i]t does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude.  More than that: it is a violation of any known principle of human dignity."  *Id*. at 972–73 (*citing Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir.1980), *cert. denied*, 451 U.S. 1022 (1981)); Shatz, Donovan & Hong, The Strip Search of Children and the Fourth Amendment, 26 U.S.F.L. Rev. 1, 11–14 (1991) (a strip search, for a child, is "akin to sexual abuse.")

The Second Circuit affirmed the district court's determination that *van Emrik* applied to "medical procedures in aid of child abuse investigations," not just examinations involving radiological testing.  *Tenenbaum v. Williams*, 193 F.3d 581, 599 (2d Cir. 1999).  The Appeals Court rejected the defendants' argument that the sexual abuse examination was medically indicated; although it was conceivable that injuries could have been found during the examination and would have needed to be treated if they had, "that possibility did not turn an investigative examination into one that is 'medically indicated' and designed for treatment."  *Id*.  Moreover, the Court noted "if [the child] had ever been in imminent danger, she was not by the time she was taken to the hospital in the custody of the [caseworker].  The caseworkers were required under *van Emrik* either to notify the Tenenbaums that [their child] was about to undergo a medical procedure and obtain the approval of either of them or to obtain judicial authorization. They did neither."  *Id*.

9

According to the Second Circuit, "the medical examination was undertaken at the initiative of a state official [and] served primarily an investigative function...." *Tenenbaum*, 193 F.3d at 606 (internal citations and quotations omitted).  As one court recently noted, *van Emrik* and *Tenenbaum* stand for the proposition children may not be subjected to investigatory medical examinations in the course of abuse investigations without court order or parental consent.  *L.B. v. City of New York*, 2025 U.S. LEXIS 45105, *23-24 (E.D.N.Y. March 12, 2025).

**2) Doctors engage in state action when they conduct investigatory, rather than medically indicated, exams of minors at the state's behest.**

Both *van Emrik* and *Tenenbaum* entailed actions against state caseworkers who requested children be medically examined to investigate allegations of abuse.  In the ensuing years, courts have considered the liability of doctors who conduct these examinations at the request of caseworkers and concluded that when they perform such examinations in the absence of medical necessity, doctors engage in state action and violate children's and parents' rights.

These decisions derive from the *Kia P. v. McIntyre*, 235 F.3d 749, 755–57 (2d Cir. 2000), where the Court found the hospital engaged in state action when it withheld a newborn from the custody of her parents based on a toxicology indicating the presence of methadone in the baby's urine.  According to the Second Circuit, when the hospital tested and treated the newborn for suspected methadone withdrawal, it was acting "in its capacity as a private provider of medical care," and was not a state actor for purposes of § 1983 liability.  *Id.* at 756.  But, when the hospital delayed releasing the newborn due to the "specter of potential child abuse or neglect," the Court said that the hospital was acting "in its social welfare role" and "as part of the reporting and enforcement machinery for" the government.  *Id*.  As such, the hospital *was* functioning as a state actor.  *Id.* at 756*; see also Estiverne v. Esernio Jenssen*, 581 F. Supp.2d 335, 345 (E.D.N.Y. Jul. 31, 2008) (same).

10

*Kia P.* establishes the "rule of decision" for cases where hospitals are charged with unlawfully detaining patients. Plaintiff does not allege that Defendants Goradia and Bralow engaged in state action by unlawfully *detaining* O.S., as erroneously asserted in Defendants' Motion for Summary Judgment. Rather, Plaintiff McInnis brought this case against the medical Defendants, Goradia and Bralow, for performing an unlawful *search* of O.S.'s body for the purposes of determining whether or not he had been abused.

Following the 2000 decision in *Kia P.*, courts have determined that hospitals and medical personnel may engage in state action in ways other than detention, as alleged in this case. One way of engaging in state action is by performing unnecessary medical examinations at the behest state actors, which violate the Fourth Amendment rights of the child to be free from unlawful searches, and the Fourteenth Amendment rights of the parent to make medical decisions for her child. *See e.g.*, *Johnson v. City of New York*, 2021 U.S. Dist. LEXIS 159482, *22-23 (S.D.N.Y. Aug. 23, 2021) ("Applying *Kia P.*, district courts have also held that a hospital is engaged in state action when its personnel administer medical tests or conduct medical examinations, at the request of the state, solely for purposes of investigation rather than diagnosis or treatment.")

In *Armstrong v. Brookdale Univ. Hosp & Med. Ctr.*, the district court found that a hospital engaged in state action when its staff performed an examination of an 11-year-old, who had been brought to the hospital by police officers, to see if she had given birth to an abandoned baby she reportedly found. 2002 U.S. Dist. LEXIS 29224 (E.D.N.Y 2002). In reaching that determination, the court found it significant that the police were the ones who brought the child in and requested that she be examined. The court denied the hospital's motion for summary judgment as to plaintiff's 1983 claims, stating, "[i]t is irrelevant … that the examinations were conducted in accordance with professional standards. What is relevant to this analysis is that

Defendants conducted the examinations at the request of the police, clearly a state actor." *Id.* at *10-11. Similarly, in the case at bar, defendant doctors conducted an examination of 11-year-old O.S. at the behest of a state actor, ACS caseworker Ms. Pray.

In *Johnson, supra*, hospital personnel physically examined two children, whose mother had been accused of abuse, at the request of ACS. The father brought an action challenging the examination of the children without parental consent. *Johnson*, 2021 U.S. Dist. LEXIS 159482. Although the plaintiff's claims failed for other reasons,[1] the court found the hospital "was a state actor insofar as it conducted medical examinations of plaintiff's children for investigatory purposes, at the request of ACS, rather than in the ordinary course of diagnosing or treating an illness or injury." *Id.* In reaching this conclusion, the district court noted that the children arrived at the hospital "at the direction of ACS," were examined without their clothes, and there was no evidence in the record that the doctors would have conducted the medical examinations in the absence of ACS's request. *Id.* at *25; *c.f. Denes Q. v. Caesar*, 2011 U.S.DIST. LEXIS 106999, *37 (E.D.N.Y Sept. 21, 2011) (finding the hospital did not engage in state action when its doctors, who suspected the child had been abused, ordered a skeletal survey and ophthalmology exam to see if there was evidence of abuse; in finding the hospital was not engaged in state action, the court noted the child was brought to the hospital by her parents, rather than on suspicion of child abuse, and "the record is clear that ACS did not order the tests at issue"). Whether such physical examinations are medically necessary under the circumstances – or whether there was time to obtain parental consent or court authorization before conducting the examination – is a fact-intensive inquiry.

---

[1] In *Johnson*, the father who filed the complaint was representing himself *pro se*, and as such was not able to properly bring the claims on behalf of his children. *Johnson*, 2021 U.S. Dist LEXIS 159482 at *13-14. Further, the plaintiff improperly alleged the hospital was responsible for the conduct of its staff on a theory of *respondeat superior* which is inapplicable to §1983 claims, and failed to plead proper *Monell* claims to hold it liable. *Id.* at *27.

**B.  Whether Defendants Goradia and Bralow Engaged in State Action by Conducting Unauthorized Physical Examinations of O.S. For Investigative Purposes Depends upon a Critical Material Fact in Dispute.**

Whether Defendants Goradia and Bralow conducted their physical examinations of O.S. for investigatory or medical purposes is a key factual issue that must be resolved by a jury and this question is critical to determining whether Defendants engaged in state action when they examined O.S. without parental consent or court order: that is, were the Defendants working to facilitate ACS's investigation into the allegations of abuse concerning O.S. or were they properly treating a medical condition.

The Second Circuit's decision in *Kia P*. and its progeny underscore the importance of examining the nature of a healthcare provider's actions on a case-by-case basis to determine whether the line was crossed from a private person to a state actor who may be held accountable under § 1983.  When a medical examination is done at the request of a child protective caseworker, it is reasonable for a fact-finder to infer that it was done for investigatory purposes. *McLoughlin v. Rensselaer County Dep't of Soc. Servs., 2019 U.S. Dist. LEXIS 137120*, \*25 (N.D.N.Y. Aug. 14, 2019) ("when an examination is brought at the request of an investigating social worker rather than a doctor, it is at least plausible that the motive was to investigate child abuse").

Indeed, whether an examination is done for medical purposes as opposed to investigative purposes is something that must be assessed by considering the circumstances and context in which the examination takes place.  In a recent decision denying a hospital's motion to dismiss 1983 claims on the grounds that it was not a state actor, the district court rejected the defendant's argument that "*Kia P*. holds that 'a medical discharge acts as the line in the sand between a hospital's conduct as private actor and its conduct as a state actor.'"  *Walston v. City of New*

*York*, 2024 U.S. Dist. LEXIS 41409, *15 (S.D.N.Y. March 7, 2024). In *Walston*, the court reasoned that to "draw the line at a formal medical discharge issued by the hospital, would be to permit the hospital to choose the moment it is deemed a state actor, and thus to choose the moment it is no longer immune from § 1983 suits. Instead, this line [of cases applying *Kia P.*] should be determined by the factual reality of whether the hospital is no longer providing medical care and is solely acting as part of the 'machinery of the state.'" *Id.* (quoting *Kia P.*, 235 F.3d at 757). As such, the determination of whether a hospital or medical personnel are conducting medical as opposed to investigatory examinations is a fact-intensive inquiry.

In this case, O.S. was examined at the request of state actors as O.S. was brought to SBH by FDNY personnel and met by Ms. Pray, a child welfare caseworker assigned to investigate the allegations of abuse, who ushered him through the registration and triage processes. SUMF ¶¶ 12, 16, 20, 30. Ms. Pray was the only adult with O.S. to provide a history to Dr. Goradia before she examined him. SUMF ¶¶ 29, 32, 109. By the time Ms. McInnis arrived at SBH, O.S. had already been physically examined by Defendant Goradia. SUMF ¶ 108. The record is less clear whether Dr. Bralow conducted her physical examination prior to Ms. McInnis's arrival, or if she did it when Ms. McInnis was present. SUMF ¶ 126. It is undisputed that Ms. Pray did not have a court order and there are no consents contained in O.S.'s SBH record for the date of his examination. SUMF ¶ 94, 102.

As in *Armstrong*, the fact that O.S. was brought to the emergency department by state actors and the medical examinations were done at their behest strongly supports the conclusion that the defendants were engaged in state action and the physical examinations were conducted for investigative purposes. Other facts in the record extensively support Plaintiff's claim that these examinations were done for the purposes of investigating allegations of abuse rather than

providing treatment as both Defendants testified that O.S.'s medical examination was conducted

to see if there were injuries consistent with the allegation of child abuse, and neither physician

provided O.S. with any medical treatment.  SUMF ¶¶ 100, 103, 115, 117.  By the time they

examined him, Nurse Beepot had already performed triage, which indicated nonemergent

circumstances.  SUMF ¶¶ 95-97; 99.  And Doctor Bralow examined O.S. even after Defendant

Goradia had examined O.S. and found he did not have any occult injuries.  SUMF ¶¶ 38, 115.

For summary judgment purposes, the moving party bears the burden of establishing the

absence of relevant facts in dispute.  *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d

54, 57 (2d Cir.1987).  Although Defendants Goradia and Bralow offer self-serving affidavits

declaring that they provided these examinations for medical rather than investigatory purposes,

that is a material issue of fact that must be determined by a jury.  Defendants cannot usurp the

jury's fact-finding role by relying on their own conclusory statements that the examinations were

medically necessary.  *Velez v. Town of Stratford*, No. 3:18-CV-1053 (VAB), 2020 U.S. Dist.

LEXIS 39184, at *18 (D. Conn. Mar. 6, 2020) ("[C]onclusory statements based on subjective

belief, without any objective evidence to support them, are insufficient as a matter of law.").

They offer no objective evidence to support their subjective assessment and the record evidence

contradicts their subjective assessment.

Further, Plaintiff objects to the admissibility of most of the statements contained in

Defendants' affidavits for the purposes of summary judgment.  First, Defendants' affidavits offer

improper expert opinions[2] about the intensions of child abusers and the psychology of victims of

child abuse when neither of them have been offered or qualified as experts.  Fed. R. Evid. 701,

---

[2] Defendant Goradia stated: "Particularly in cases of alleged child abuse, injuries are designed to be hidden, and children may not tell the truth about the abuse, making a thorough head to toe medical screening examination critical."  Defendant Bralow stated: "Particularly in cases of alleged child abuse, injuries may be subtle or hidden, making a thorough medical screening examination critical." *See* response to SUMF ¶ 82.

702.  *See* Plaintiff's response to SUMF ¶ 82.  Second, Defendants' affidavits impermissibly offer

opinions on ultimate legal questions, namely that their examinations were medically necessary.

*See* Plaintiff's response to SUMF ¶ 82.  Such conclusory statements should be stricken.  *See e.g.*,

*Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 568 (E.D.N.Y. 1999) ("conclusory

allegations, legal arguments, and statements not based upon personal knowledge, may be

stricken") (citing *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir. 1988) (lack of

personal knowledge); *Kamen v. American Tel. & Tel. Co*., 791 F.2d 1006, 1011 (2d Cir. 1986)

(conclusory allegations and legal arguments)).  Admitting such testimony regarding ultimate

legal issues "invade[s] the province of the court to determine the applicable law and to instruct

the jury as to that law." *F.A.A. v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983).  Third, Plaintiff

objects to Defendants' statements that offer opinions about the law[3] which is improper under

Federal Rule of Evidence 701.   *See* Plaintiff's response to SUMF ¶ 82.  Lastly, Defendant

Bralow included testimony in her affidavit about her obligation to conduct a "thorough physical

examination" to rule out "injury to the airway, injury to blood vessels in the neck such as

dissection of the carotid artery, head injury and internal bleeding" which she claimed "would not

be ascertainable by a visual inspection alone."  Those statements are contradicted by her

deposition testimony in which Defendant Bralow was asked what she did to physically examine

O.S. and she testified "I looked at his general appearance. I looked at the -- the spot on his neck

and I talked with him."  *See* Plaintiff's response to SUMF ¶ 82.  Defendant Bralow's affidavit

must be disregarded because a party cannot rely on a "sham affidavit" which repudiates sworn

deposition testimony in order to procure summary judgment.  *See Fed. Deposit Ins. Corp. v.*

---

[3] Defendants each stated: "Furthermore, under federal law (EMTALA) any patient presenting to the Emergency Department is required to have an appropriate medical screening exam by a qualified medical professional (a licensed physician or physician extender) to determine whether or not an emergency medical condition exists."  *See* response to SUMF ¶ 82.

*Murex LLC*, 500 F. Supp. 3d 76, 95 (S.D.N.Y. 2020) (holding that "purpose of [sham affidavit] rule—which is to respect the deposition process and prevent witnesses from repudiating sworn testimony once adversarial questioning has ceased—equally applies to sham affidavits offered to procure judgment for the offering party.")

In considering Defendants' Motion, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. The fact that the examination was done at the request of a child protective caseworker creates a reasonable inference that the "motive was to investigate child abuse," *McLoughlin*, 2019 U.S. Dist. LEXIS 137120 at *25, and Defendants cannot rebut that inference through their affidavits. Moreover, as discussed *infra*, the subjective intent of the Defendants in this case is not the relevant inquiry.

Not only does the record in this case confirm that O.S. was medically examined at the behest of a state child welfare worker, but the testimony of the hospital defendants also confirms that they were acting pursuant to SBH policy designed to support and abet state actors who bring children in for examination upon suspicions of child abuse. Defendants Goradia and Bralow expressed an unflinching willingness to examine pediatric patients without securing parental consent, as required by New York Public Health Law § 2504(4), whenever they were accompanied by police, teachers, or ACS caseworkers – in the absence of any true medical emergency. SUMF ¶¶ 25-28. Defendant Goradia said clearly that "In cases of suspected child abuse where the [abuser] is in the same household as the child, we reserve the right to examine the child without explicit consent, particularly in cases where the child is brought in by ACS." SUMF ¶ 127.

The record is clear that the hospital protocol required significant cooperation with child welfare agents by placing all children who come into the hospital with ACS workers on

17

"elopement precaution," designed to prevent them from leaving the hospital.  SUMF ¶¶ 23, 100.

These children are placed in distinct hospital gowns that identify them to hospital security, and

staff are assigned to continuously supervise them while they are at SBH.  SUMF ¶¶ 23, 100.

That the doctors and hospital were working hand in hand with ACS is readily apparent, so much

so that the doctors appeared unfazed by the request to fully examine a child presenting with

superficial scratches and no other signs of trauma when an ACS caseworker asked them to do so.

Whether Defendants examined O.S. for strictly medical purposes – as they maintain in

their unsupported affidavits – or for investigative purposes as their testimony concerning the

circumstances surrounding the examinations suggests, is a dispute of material fact that precludes

summary judgment.

### C.  Whether O.S. Was Suffering from a Medical Emergency That Justified Being Physically Examined Before Parental Permission or a Court Order Could Be Obtained Is Material Fact Also in Dispute.

The rule established by the Second Circuit in *Tenenbaum*, is that children may not be

subjected to emergency removals when there is reasonable time "consistent with the safety of the

child to obtain a judicial order."  *Tenenbaum*, 193 F.3d at 595.  The Court found it significant

that no one made any effort to obtain the parent's permission before removing her daughter from

school to be medically examined, and no one sought a court order either.  *Id.* at 590 ("no one

considered making an attempt -- to obtain parental consent for a physical examination of Sarah

as provided by § 1021 of the New York Family Court Act.  And no one considered seeking a

court order for her removal and examination under § 1022 of that Act 6 even though Williams

understood that such an order could be obtained within a day.").  The Court emphasized that

"'Emergency circumstances mean circumstances in which the child is immediately threatened

with harm.' [] The mere 'possibility' of danger' is not enough." *Tenenbaum*, 193 F.3d at 594

(quoting *Robison v. Via*, 821 F.2d 913, 922 (2d Cir. 1987)).

The Court applied the same logic to medical examinations of children – if there is

sufficient time to obtain parental permission or a court order without jeopardizing the safety of

the child, such authorization must be obtained before subjecting the child to the examination.

Announcing this rule, the Circuit court stated:

> We find that the Fourth Amendment's reasonable or probable cause
> and exigent circumstances doctrines apply to searches and seizures
> made in the course of child abuse investigations.  Accordingly, in
> the absence of a warrant equivalent, in order for the examination to
> have been constitutional, reasonable or probable cause or exigent
> circumstances justifying an emergency examination must have
> existed at the time the examination was performed.

*Tenenbaum*, 193 F.3d at 606.

The Court concluded in *Tenenbaum* that there was no emergency in that case that

justified the examination of the child without parental permission or a court order – even though

serious allegations of sexual abuse had been raised.  In reaching that conclusion, the Court

considered, just as it must here, how much time had passed between the time the complaint had

been made, the fact that the child did not appear to be in any acute physical distress, and the fact

that if the child "had ever been in imminent danger, she was not by the time she was taken to the

hospital in the custody of the [caseworker]." *Tenenbaum*, 193 F.3d at 599.  Significantly, the

fact that the child was brought to the emergency room did not mean she was in fact suffering

from a medical emergency such that parental consent or court order were no longer required.  *Id*.

As in *Tenenbaum*, the record reveals that although O.S. was brought to the emergency

room on allegations of abuse or neglect, he was not suffering from an emergency medical

condition that required immediate treatment, and that delaying such treatment in order to seek

parental permission or a court order would not jeopardize O.S.'s safety.  SUMF ¶¶21-22, 97.

Defendant Goradia testified that O.S.'s triage record indicated he was in need of "emergency

medical assessment" rather than any "emergency medical treatment."  SUMF ¶ 118.  The record

further establishes that the defendants knew, and that any reasonable emergency room doctor

would know, that O.S. did not require immediate medical treatment.  Defendants Goradia and

Bralow examined O.S. after he had already been assessed at triage and determined to be in stable

physical condition and not suffering from any acute physical injuries necessitating immediate

attention.  SUMF ¶ 21-22; 97.  He was awake, alert, verbal, did not have any difficulty breathing,

presented with good circulation, and he was visibly playful and smiling at the time of his triage

assessment. SUMF ¶ 108.  Dr. Bralow confirmed that the fact that he was noted to be "playful

smiling" in his mental status of his triage assessment "decreases concern that the child is very,

very sick." SUMF ¶ 110.  At the time Dr. Goradia performed her medical examination, O.S.

appeared comfortable and knew who he was and where he was.  SUMF ¶ 109.  Though he made

allegations of being beaten all over his body, the only external indication of harm were

superficial scratch marks on his neck – marks that did not require medical treatment. SUMF ¶ 11,

20, 116.

Defendants claim in their affidavits that they were required to examine O.S. to see if

there were any "non-apparent injuries which may have been emergent" because "in cases of

alleged child abuse, injuries may be subtle or hidden, making a thorough medical screening

examination critical." SUMF ¶ 85-86.  If accepted, Defendants' arguments would serve to justify

the invasive examination of every child brought into the emergency room with allegations of

abuse – which has been rejected by *Tenenbaum*.  In truth, while there was nothing about O.S.'s

triage assessment that suggested there may be some hidden injury that could have potentially

been life threatening (more than eight hours after he allegedly had been beaten), as Defendant

Goradia testified, when a pediatric patient is brought in by ACS, "there's an assumed

emergency." SUMF ¶ 106. And the possibility that injuries could have been found during the

examination – which would have been treated – does not justify the examination being

conducted without securing consent or a court order. *See Tenenbaum*, 193 F.3d at 599.

Moreover, the relevant question is not whether the defendants believed they needed to

medically examine O.S. after he was cleared by triage; the question is whether it was objectively

reasonable for an emergency room doctor to believe that delaying O.S.'s examination until a

court order or parental permission could be obtained would have jeopardized O.S.'s life or

health. *Tenenbaum*, 193 F.3d at 609. That is a factual determination within the exclusive

province of the jury. Defendants cannot achieve summary judgment via self-serving affidavits

declaring that the examinations they performed were medically necessary. Doing so would

create an end-run around the protections to bodily integrity and parental decision-making

established by *Tenenbaum* and its progeny.

Indeed, accepting the doctors' subjective claims that they acted appropriately runs afoul

of the 1983 case law addressing Fourth Amendment violations, which relies on an objective

standard. *See e.g.*, *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("An officer's evil intentions

will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor

will an officer's good intentions make an objectively unreasonable use of force constitutional.").

Allowing Defendants to unilaterally dictate the ultimate factual determination of whether

their actions were medically necessary would be analogous to granting summary judgment to

police officers accused of excessive force who simply announce that the force they used was

necessary; such deference has been rejected by the Second Circuit. *See O'Bert v. Vargo*, 331

F.3d 29, 37 (2d Cir. 2003) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (7th Cir. 1994)) ("'the court may not simply accept what may be a self-serving account by the police officer' ... Rather, the court must also consider 'circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably'").  Just so here.  In both cases, the court must consider the circumstantial evidence that tends to support or discredit the reasonableness of the state actor's actions.

Nor can Defendants secure summary judgment by claiming that Plaintiff requires an expert opinion to contradict their assertion of medical necessity – particularly when they do not have any expert testimony to offer on the issue.  *See e.g.*, *Madden v. Abate*, 800 F.Supp.2d 604, 610-11, (D. Vt. 2011) (district court denied summary judgment, rejecting the defendant doctor's claim that the plaintiff needed expert testimony to establish her claim that the medical examination that the defendant performed on her was for his sexual gratification as opposed to diagnostic purposes).  Whether O.S. exhibited any need for treatment before parental consent or court authorization falls well within the purview of the jury without the need for experts.  It entails observations of the witnesses, testimonial evidence, and other record evidence – including O.S.'s claim that his alleged abuse occurred hours before he went to the hospital, and after he had spent an entire day at school without medical complications.  Moreover, Defendants have no expert witness to buttress their contention that the medical examinations of O.S. were medically necessary.  The Defendants are lay witnesses who have not been offered or qualified as experts.

Further the record sharply contradicts their bald assertions that it was medically necessary to examine O.S. on an immediate basis, without waiting for parental consent or a court order.  Paradoxically, the continuous observation protocol for children brought in by ACS led Nurse

Beepot to assign O.S. a higher triage level than was perhaps otherwise required by his physical presentation, leading to his continuous observation at SBH further dilutes Defendants' argument that he needed to be medically examined before parental permission or a court order could be obtained.  Surely, if O.S.'s condition had at any point worsened, or if he required any medical treatment, the hospital staff charged with observing him would have been able to promptly seek such attention.  Instead, they noted him to be awake, alert, eating and calm throughout his admission at SBH.  SUMF ¶¶ 47, 101.  Nothing from his continuous observation log suggests he was ever in distress, or a nurse or doctor was needed to address any issues with which he presented. SUMF ¶ 101

Moreover, O.S. presented to SBH at approximately 3:14 p.m., which would have been about eight hours after he arrived at school and claimed he had been beaten.  SUMF ¶¶ 15.  The significant passage of time between the alleged assault and the time he was seen at SBH, in addition to the lack of any acute injuries or distress, suggests that he, like the child in *Tenenbaum*, did not suffer from a true medical emergency that required immediate treatment. This is true even though O.S. presented at an emergency room with allegations that could, if they had been true, have caused injuries requiring treatment.  *See Tenenbaum v. Williams*, 193 F.3d at 599 (rejecting this precise argument).

Defendants Goradia and Bralow should have made some effort to obtain O.S.'s mother's consent or asked Ms. Pray to present a court order authorizing the examination, before simply examining him to see if he had been abused as he claimed.  However, the record is clear that they made no such effort before physically examining O.S.  As such, Defendants' warrantless physical examinations of O.S. were not justified by a medical emergency and constitute unreasonable searches under the Fourth Amendment.

**D. If Conducted for Investigative Purposes, in the Absence of An Emergency, The Physical Examinations of O.S. Constitute Unreasonable Searches in Violation of His Fourth Amendment Rights and His Mother's Fourteenth Amendment Rights.**

If conducted for investigative purposes, in the absence of medical emergency, the physical examinations that Defendants Goradia and Bralow performed on O.S. on October 28, 2022, constitute unlawful searches under the Fourth Amendment. As the Second Circuit held in *Tenenbaum*, the physical examination does not need to pose a risk of physical harm to be worthy of Fourth Amendment protections – when children are physically examined by strangers, without the comfort of their parents – it can pose risk of significant emotional harm. *Tenenbaum*, 193 F.3d at 598, 606. The district court, which first reached this conclusion, noted that the child "was subjected to intrusive bodily examinations by two strangers, in a strange location, in the absence of a parent or other reassuring figure . . . [and accordingly] plaintiffs have established, as a matter of law, that their procedural due process rights were violated." *Tenenbaum*, 862 F. Supp. at 973. As discussed *supra*, where a child's rights are violated by having an unauthorized medical examination conducted for investigative purposes, his parent suffers the corollary violation of her Fourteenth Amendment to give or withhold consent before her child is subjected to such a medical procedure.

As in *Tenenbaum* and *Johnson*, Defendant Goradia's physical examination of O.S. was of a physical nature, of his unclothed body, conducted by strangers, in a strange location, without O.S.'s parent or anyone else known to him. SUMF ¶¶ 104, 121, 125. Whether Ms. McInnis was in the room when Defendant Bralow physically examined O.S. is disputed; but everyone agrees that he was disrobed and in a room with strangers up until the point when Ms. McInnis arrived. SUMF ¶¶ 104, 105, 120-126. Such examinations put O.S. at risk of severe emotional harm and are worthy of Fourth Amendment protections.

The unauthorized examinations of O.S. are also a violation of Ms. McInnis's rights under the Fourteenth Amendment to either consent or withhold consent before such examinations occur.  Such a right has long been recognized as part of the continuum of rights that fall under parents' fundamental right to the care, custody and management of their children.  *See van Emrik*,  911 F.2d at 867.  All parents have the right to be informed and be given the opportunity to object before their children are disrobed and subjected to a full body physical examination, and the law requires more than doctor say so to violate such a fundamental parental right.

The medical records are devoid of any parental consent on file for O.S. on October 28, 2022, and the Defendants confirmed they neither obtained, nor made any effort to obtain, consent from O.S.'s parent before conducting their physical examinations.  SUMF ¶¶ 25-27, 102.  Defendants' contention that Ms. McInnis arrived at some point during O.S.'s examination, and "never directed Defendants not to examine O.S.,"[4] is a flagrant attempt to shift the burden to Ms. McInnis to ask Defendants to stop an examination, where the onus was on the Defendants to not examine him without her consent.

Indeed, performing a medical examination in the absence of express consent constitutes unlawful touching (assault and battery), even where the doctor acts in a way that he believes is medically necessary or appropriate.  The Second Circuit in *Armstrong* considered this very issue. *Armstrong v. Brookdale Univ. Hosp & Med. Ctr.*, 425 F.3d 126 (2d Cir. 2005).  In finding that the verdict sheet included errors concerning the issues of battery claims and uninformed consent, the Court held "even where the doctor adhered to the requisite standard of care in performing a procedure or conducting an examination, the patient may recover for injuries she suffered as a

---

[4] It is also highly deceptive to say that Ms. McInnis "never directed Defendants not to examine O.S."  When Ms. McInnis was asked at her deposition whether she ever told anyone at the hospital that she did not want O.S. to be examined, she replied: "Well, they did it before I got there."  SUMF ¶ 108.  Dr. Goradia also confirmed that she examined O.S. before Ms. McInnis arrived at SBH.  SUMF ¶¶ 73, 108.

result of the procedure or examination if the doctor failed to obtain her informed consent." *Id*. at 133.

### E.  EMTALA Does Not Permit Medical Staff to Bypass Their Obligations Under *Tenenbaum* and New York Public Health Law Requiring Consent.

Defendants attempt to use their obligations under the Emergency Medical Treatment and Active Labor Act (EMTALA) to provide treatment to patients who present at the emergency room, regardless of their ability to pay for treatment, as a shield for liability for treating patients without consent and absent medical emergency.  42 U.S.C. § 1395dd.  This is a misconstruction of EMTALA and the New York Public Health Law.  Congress enacted EMTALA to "combat[] 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions are stabilized.'" *Weller v. NYU Langone Health Sys.*, 2025 U.S. Dist. LEXIS 124171, *5 (E.D.N.Y. June 30, 2025) (quoting *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999).   In other words, EMTALA "prevents hospitals from refusing to provide any initial screening or refusing to stabilize a patient presenting to an emergency room."  *Wright v. Stephens*, 2025 N.Y. App. Div. LEXIS 3517, *9-10 (4th Dept. June 6, 2025) (internal citations omitted).  It creates a private right of action that amounts to "failure to treat" "to fill a lacuna in traditional state tort law by imposing on hospitals a legal duty (that the common law did not recognize) to provide emergency care to all."  *Hardy*, 164 F.3d at 792-93.  EMTALA speaks to hospitals' liability if they fail to take action to stabilize individuals presenting with emergency medical conditions, not a compulsion to provide full medical examinations to patients who are stable, regardless of whether they consent – or are able to consent – to such examinations.

As New York Public Health Law § 2504(4) makes clear, physicians are not permitted to provide medical care to minors without their parent's consent, unless "an emergency exists and

the minor is in immediate need of medical attention, and any attempt to secure consent would delay treatment and increase the risk to the child's life or health." Further, EMTALA explicitly does not preempt state law. 42 U.S.C. § 1395dd(f).

O.S. was assessed to be stable after he was seen at triage and there was no need under EMTALA to examine him further before parental consent or court order could be obtained. SUMF ¶ 97. Accordingly, Defendants' claims that they were required, pursuant to EMTALA to physically examine O.S. after he was assessed at triage to be stable is unavailing and cannot shield them from their obligation to obtain consent to treat patients in their care.

## **CONCLUSION**

For the reasons discussed herein, Plaintiff Jennifer McInnis respectfully requests that the Court deny Defendants' Motion for Summary Judgment.

Dated:        New York, New York
              July 31, 2025

                                        WERTHEIMER FLEDER LLP

                                        By:    _____

                                        Mara Fleder
                                        Joel Wertheimer
                                        *Attorneys for Plaintiff*
                                        14 Wall Street, Ste 4C
                                        New York, New York 10005
                                        (646) 344-4212
                                        mara@wfllp.com

To:    Samantha E. Quinn, Esq. *via ECF*
       Schiavetti, Corgan, Soscia, DiEdwards & Nicholson, LLP
       *Attorneys for Defendants*