UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER MCINNIS, individually and on behalf of her infant children O.S., C.S. (female), and C.S. (male),<br><br>      Plaintiffs,<br><br>-v-<br><br>CITY OF NEW YORK, et al.,<br><br>      Defendants. | 24-CV-3449 (GHW) (RFT)<br><br>**REPORT & RECOMMENDATION** |

**TO THE HONORABLE GREGORY H. WOODS, UNITED STATES DISTRICT JUDGE:**

Plaintiff Jennifer McInnis, individually and on behalf of her minor son O.S., brought claims under 42 U.S.C. § 1983 against the City of New York ("City"), Administration of Children's Services ("ACS") employees Treasure Pray and Jordan Mews, and St. Barnabus Hospital ("SBH") employees Nyasha Beepot, a registered nurse, Dr. Leah Bralow, and Dr. Rutmi Goradia, alleging civil rights violations arising out of O.S. being taken from school and subjected to medical examinations without parental consent on October 28, 2022, after he made a false report of corporal punishment by his adult brother. (*See generally* ECF 1, Compl.) The only remaining defendants are Drs. Bralow and Goradia. (*See* ECF 73, Not. of Voluntary Dismissal; ECF 115, Stip. of Voluntary Dismissal.)[1] Pending before the Court is a motion by Drs. Bralow and Goradia for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*See* ECF 140, Mot. for Summ. J. at 1-2.) Having carefully reviewed the parties' submissions, and for the reasons set forth below, I respectfully recommend that Your Honor should GRANT the motion for summary judgment (ECF 140) in favor of Drs. Bralow and Goradia.

---

[1]  The Complaint also included claims on behalf of McInnis' two other minor children, C.S. and C.S., but those claims were resolved as a result of the voluntary dismissals of the claims against all Defendants other than Drs. Bralow and Goradia. (*See* ECF 154, Not. of Voluntary Dismissal.)

**BACKGROUND**

I.      **Statement of Facts**

"The following facts – drawn from the admissible materials that the parties submitted in connection with these motions – are either undisputed or, where noted, described in the light most favorable to the relevant non-moving party." *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 209-10 (S.D.N.Y. 2022), *reconsidered in unrelated part*, No. 16-CV-0740 (JMF), 2022 WL 3018104 (S.D.N.Y. July 29, 2022).

Plaintiffs' claims arise out of, among other events, the removal of one of McInnis' minor children, O.S., from his school on October 28, 2022, following a report of child abuse, and the subsequent medical examinations performed by Drs. Goradia and Bralow at SBH without McInnis' consent. (*See generally* ECF 140-30, Defs.' Rule 56.1 Statement of Undisputed Material Facts ("Defs.' SUMF"); ECF 142, Pls.' Rule 56.1 Counterstatement of Undisputed Material Facts ("Pls.' CSUMF").)

On the morning of October 28, 2022, O.S. told someone at his school that McInnis and her adult son, James Taylor, had beaten O.S. because of his misbehavior and that Taylor had punched him in the stomach and back, slapped and punched him after throwing him onto the bed, "put his foot onto O.S.'s head," banged O.S. against the wall, punched him in the nose, and choked O.S. to the point that he could not breathe; and that McInnis had struck O.S. three times with a boot. (ECF 140-30 Defs.' SUMF ¶¶ 4-7; ECF 142, Pls.' CSUMF ¶¶ 4-7.) A school employee made a report of child abuse to ACS that morning. (*See* ECF 140-30 Defs.' SUMF ¶¶ 8, 11; ECF 142, Pls.' CSUMF ¶¶ 8, 11; ECF 144-1, Def.'s Reply to Pls.' CSUMF ("Defs.' RCSUMF")

¶¶ 8, 11; ECF 140-17, CPS Connections Records at 1.)[2] Upon receiving the report, an ACS

employee assigned ACS caseworker Pray to O.S.'s case. (*See* ECF 140-30, Defs.' SUMF ¶¶ 8-9,

12; ECF 142, Pls.' CSUMF ¶¶ 8-9, 12.)

O.S. was taken by a New York City Fire Department ("FDNY") ambulance from his school

to SBH, which is a private hospital; he arrived at the SBH emergency department around 3:14

p.m. (*See* ECF 140-18, Certified St. Barnabas Hospital Records ("SBH Records") at 576;[3] ECF 140,

Defs.' SUMF ¶¶ 15-17; ECF 142, Pls.' CSUMF ¶¶ 15-17.) O.S. completed registration and then

Beepot, a registered nurse, performed a triage exam and took O.S.'s vitals. (*See* ECF 140-30,

Defs.' SUMF ¶¶ 20-21; ECF 142, Pls.' CSUMF ¶¶ 20-21.) Nurse Beepot noted that O.S. appeared

playful and smiling. (*See* ECF 140-18, SBH Records at 577-78; ECF 142. Pls.' CSUMF ¶¶ 95-96;

ECF 144-1 Defs.' RCSUMF ¶¶ 95-96.) Although the record is unclear as to the exact timing, Pray

joined O.S. at SBH after his registration was complete, sometime during his triage assessment

by Nurse Beepot. (*See* ECF 140-30, Defs.' SUMF ¶¶ 17-18; ECF 140-18, SBH Records at 576-78;

ECF 142, Pls.' CSUMF ¶¶ 17-18.)

---

[2]     The CPS Connections Records (ECF 140-17) contain excerpts from O.S.'s ACS records, including the Intake Report, Investigation Progress Notes, and Connections Stage Summary. (*See* ECF 140-1, Decl. of Samantha Quinn in Supp. of Mot. for Summ. J. ¶ 2(I).) These documents are kept in the regular course of business by ACS, which "has a statutory duty to maintain a comprehensive case record for the children . . . ." *Matter of Adonis H.*, 156 N.Y.S.3d 478, 479 (1st Dep't 2021). As such, the CPS Connections Records would be admissible at trial as business records, and a custodian would be called to testify to their authenticity; the Court therefore may consider the CPS Connections Records on this summary judgment motion. *See Emanuel v. Gap, Inc.*, No. 19-CV-03617 (PMH), 2022 WL 3084317, at *3 (S.D.N.Y. Aug. 3, 2022).

[3]     The SBH Records include a certification by a document custodian that the "health record is a full and complete copy made in the regular course of hospital business" for treatment rendered by SBH to O.S. from his date of birth to October 28, 2022. (ECF 140-18, SBH Records, at 2.) As such, the SBH Records are admissible business records. *See Tradax Energy, Inc. v. Cedar Petrochems., Inc.*, 317 F. Supp. 2d 373, 379 (S.D.N.Y. 2004).

Nurse Beepot indicated that O.S.'s "chief complaint/mechanism of injury" was assault and recorded that:

> as per EMS/ACS pt was assaulted by his older 25-year-old brother. Pt has scratches and bruising noted to body. C/O left arm and right neck pain. Pt sts he has a headache.

(ECF 140-30, Defs.' SUMF ¶ 20; *see also* ECF 140-18, SBH Records at 576; ECF 142, Pls.' CSUMF ¶ 20.) Nurse Beepot assessed O.S.'s pain level from his headache to be six out of ten but found that his vital signs were normal. (*See* ECF 140-18, SBH Records at 576-77; ECF 140-30, Defs.' SUMF ¶ 21; ECF 142, Pls.' CSUMF ¶ 21.) She assigned O.S. triage acuity level three, which indicates that a patient is not experiencing an active emergency but "should be seen as soon as a doctor is available." (ECF 140-18, SBH Records at 576; ECF 140-30, Defs.' SUMF ¶¶ 21-22; ECF 142, Pls.' CSUMF ¶¶ 21-22.)

Pursuant to SBH's "elopement precaution" policy, O.S. was placed in a yellow hospital gown and continuously supervised by SBH staff while he waited to see a physician. (ECF 140-30, Defs.' SUMF ¶ 23; ECF 142, Pls.' CSUMF ¶ 23.) Dr. Goradia, a resident physician at SBH, examined O.S. (*See* ECF 140-30, Defs.' SUMF ¶ 32; ECF 142, Pls.' CSUMF ¶ 32.) McInnis arrived at the hospital at some point during Dr. Goradia's examination; Dr. Goradia noted McInnis' presence in the examination room as of 6:04 p.m. (*See* ECF 140-18, SBH Records at 583.) The parties dispute at what point during the examination McInnis arrived: Plaintiffs assert that McInnis arrived after Dr. Goradia had completed her exam. (*See* ECF 142, Pls.' CSUMF ¶ 36; ECF 144-1 Defs.' RCSUMF ¶ 36.)

Dr. Goradia reviewed Nurse Beepot's triage notes and obtained a history from O.S. and Pray. (*See* ECF 140-30, Defs.' SUMF ¶ 32; ECF 142, Pls.' CSUMF ¶ 32.) Dr. Goradia then

conducted a physical examination of O.S.'s head, ears, eyes, nose and throat, neck, respiration, chest, abdomen, skin, neurological function, and musculoskeletal function. (*See* ECF 140-30, Defs.' SUMF ¶ 32; ECF 140-18, SBH Records at 581-583; ECF 142, Pls.' CSUMF ¶ 32.) Dr. Goradia recorded O.S.'s assertions that "his brother choked him and beat him," that he "hurts everywhere, and that this has happened before"; however, she observed that O.S. frequently changed his story. (ECF 140-18, SBH Records at 581; ECF 140-30, Defs.' SUMF ¶¶ 33, 36; ECF 142, Pls.' CSUMF ¶¶ 33, 36.)

Dr. Goradia also documented McInnis's account of what happened: "[O.S] was upset because [McInnis] took away his video game," and McInnis and Taylor, "grabbed [O.S] by his collar to stop him from running [in]to a busy street." (ECF 140-18, SBH Records at 581; ECF 140-30, Defs.' SUMF ¶ 36; ECF 142, Pls.' CSUMF ¶ 36.) Dr. Goradia noted that O.S. frequently asked about his video game and why he could not have it back. (*See* ECF 140-18, SBH Records at 581; ECF 142, Pls.' CSUMF ¶ 36.) Dr. Goradia's discharge recommendation stated that O.S. had "no visible injuries consistent with [O.S.'s] story." (ECF 140-18, SBH Records at 582; ECF 140-30, Defs.' SUMF at 38; ECF 142 Pls.' CSUMF ¶ 38.)

Dr. Bralow, an attending physician, subsequently examined O.S. and performed a faculty attestation as required for supervision of resident physicians. (*See* ECF 140-18, SBH Records at 583; ECF 140-30, Defs.' SUMF ¶ 39; ECF 142, Pls.' CSUMF ¶ 39.)[4] Dr. Bralow observed that O.S. was an "11 yoM w/ autism sent by school after saying that his brother choked him" and that he

---

[4]    Resident physicians must present their findings to an attending physician. Attending physicians are required to supervise residents and note the following faculty attestation on the patient's chart: "I have examined and/or interviewed this patient. I have discussed with the PA/Resident examining this patient." (ECF 140-30, Defs.' SUMF ¶ 39.)

had abrasions on his neck. (ECF 140-18, SBH Records at 583; *see also* ECF 140-30, Defs.' SUMF ¶ 42; ECF 142, Pls.' CSUMF ¶ 42.)

Dr. Bralow concluded that O.S.'s story was inconsistent and took note of McInnis' account, which was that Taylor grabbed O.S.'s shirt collar while preventing O.S. from running into traffic. (*See* ECF 140-18, SBH Records at 583.) Dr. Bralow further noted that Pray was in the emergency room with the family and "endorse[d] that [McInnis's] story [was] likely correct." (*Id.* at 583.) Dr. Bralow observed that O.S. had an abrasion on his neck but no bruising or other injuries. (*See id.*) After Dr. Bralow completed her examination, O.S. was medically approved for discharge to McInnis. (*See* ECF 140, Defs.' SUMF ¶ 45; ECF 142, Pls.' CSUMF ¶ 45.) Dr. Bralow entered the note clearing O.S. for discharge at 6:04 p.m. (*See* ECF 140-18, SBH Records at 583.) O.S.'s discharge orders were entered at 6:11 p.m., and O.S. was discharged around 6:15 p.m. (*See id.* at 573, 584-85; ECF 140-30, Defs.' SUMF ¶¶ 47-48; ECF 142, Pls.' CSUMF ¶¶ 47-48.)

## II.    Procedural History

On May 3, 2024, Plaintiffs filed this action against the City, two ACS employees (Pray and Mews), and three employees of SBH (Nurse Beepot and Drs. Bralow, and Goradia), alleging violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments. (*See* ECF 1, Compl. ¶¶ 1-2.) On May 8, 2024, Your Honor referred the matter to Magistrate Judge Valerie Figueredo for general pretrial supervision and dispositive motions. (*See* ECF 27, Order of Ref.) On May 9, 2024, the referral was reassigned to me.

Five Defendants filed answers to the Complaint by August 15, 2024. (*See* ECF 36, Beepot Ans.; ECF 45, Bralow Ans.; ECF 54, Goradia Ans.; ECF 71, City and Pray Ans.) On August 16, 2024, Plaintiffs voluntarily dismissed their claims against Mews (*see* ECF 73, Not. of Voluntary

6

Dismissal), and on May 19, 2025, Plaintiffs voluntarily dismissed their claims against Nurse

Beepot (*see* ECF 115, Stip. of Voluntary Dismissal).

On April 2, 2025, Plaintiffs reached a settlement in principle with the City and Pray (*see*

ECF 119, Suppl. Decl. of Jennifer McInnis ¶ 17), which I approved on June 3, 2025 (*see* ECF 123,

Infant Compromise Order; ECF 126, Order), leaving Drs. Bralow and Goradia as the only

remaining Defendants. Plaintiffs allege that Drs. Bralow and Goradia violated 42 U.S.C. § 1983,

denying O.S. his Fourth Amendment right to be free from unreasonable searches and intrusions

into his person and denying McInnis her Fourteenth Amendment procedural due process rights,

by examining O.S. without either McInnis's consent or judicial authorization, exigent

circumstances, or probable cause. (*See* ECF 1, Compl. ¶¶ 185-86.)

Drs. Bralow and Goradia filed the pending motion for summary judgment on June 27,

2025, seeking dismissal of all claims against them. (*See* ECF 140, Mot. For Summ. J.)[5] They argue

that as physicians employed by a private hospital, they are not subject to liability under 42

U.S.C. § 1983; and that their examinations of O.S. were medically necessary to determine

whether he had life-threatening injuries. (*See* ECF 140-31, Defs.' Mem. In Supp. Of Mot. For

Summ. J. (Defs.' Mem.") at 1.) Plaintiffs filed their opposition on July 31, 2025. (*See* ECF 142,

Pls.' Mem. In Opp. To Mot. For Summ. J. ("Pls.' Opp."); ECF 142, Pls.' CSUMF.) Drs. Bralow and

---

[5]     Defendants filed the following documents, among others, in support of their summary
judgment motion: a memorandum of law (ECF 140-31); Defs.' SUMF (ECF 140-31); an attorney
declaration attaching exhibits (ECF 140-1); McInnis' deposition transcript (ECF 140-5); Dr.
Bralow's deposition transcript (ECF 140-6, ECF 140-7, ECF 140-8, ECF 140-9); Dr. Goradia's
deposition transcript (ECF 140-10, ECF 140-11); Nurse Beepot's deposition transcript (ECF 140-
12, ECF 140-13); Pray's deposition transcript (ECF 140-14, ECF 140-15, ECF 140-16); the CPS
Connections Record (ECF 140-17); the SBH Records (ECF 140-18); Dr. Bralow's affidavit (ECF
140-19); and Dr. Goradia's affidavit (ECF 140-20).

Goradia filed their reply on August 15, 2025. (*See* ECF 144, Defs.' Reply in Supp. Of Mot. For Summ. J. ("Defs.' Reply"); ECF 144-1, Defs.' RCSUMF.) At the parties' request, on September 26, 2025, I heard oral argument on the motion.

<strong><u>LEGAL STANDARDS ON MOTIONS FOR SUMMARY JUDGMENT</u></strong>

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court shall grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6] A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the nonmoving party. *Id.* at 255.

Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." *Nebraska v. Wyoming,* 507 U.S. 584, 590 (1993). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247-48).

---

[6]     Unless otherwise indicated, this report and recommendation omits internal quotation marks, citations, and alterations from quoted text.

Once the moving party has shown that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co. v. Zenith Radio* Corp., 475 U.S. 574, 587 (1986); the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

Evidence submitted at summary judgment need not be presented in an admissible form if the content could be presented in an admissible form at trial. *See Emanuel v. Gap, Inc.*, No. 19-CV-03617 (PMH), 2022 WL 3084317, at *3 (S.D.N.Y. Aug. 3, 2022). A party can successfully oppose a summary judgment motion on the ground that it would be impossible for the evidence on which the movant relies to be presented in an admissible form at trial. *See* FRCP 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Ruffin v. Kirschenbaum & Phillips P.C.*, No. 20-CV-5422 (PMH), 2022 WL 704943, at *3 (S.D.N.Y. Mar. 9, 2022). However, a party does not create an issue of material fact by objecting to evidence based on admissibility if the content would be admissible at trial. *See Emanuel,* 2022 WL 3084317, at *4 ("An objection to the admissibility of a document is not the equivalent of a contention that the document's contents are untrue.") (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 314 (2d Cir. 2008)).

Furthermore, a nonmoving party cannot raise a genuine factual dispute by challenging the credibility of the witnesses. *See, e.g., Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242, 246 (2d

Cir. 2020). "[T]he general rule remains that a district court may not discredit a witness's deposition testimony or declaration on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." *Id.* Instead, a court must accept uncontroverted and unchallenged assertions of fact on the record as true unless the nonmoving party presents affirmative evidence to the contrary. *See, e.g., Island Software & Comput. Serv. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact."). The mere fact that a witness is an interested party whom the jury is not required to believe "does not in and of itself raise a genuine issue of material fact." *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 692 (2d Cir. 2017) (holding that the lower court had properly relied on "uncontradicted and unimpeached" testimony of an "interested witness" to grant a motion for summary judgment).

## LEGAL STANDARDS GOVERNING PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983

Section 1983 provides a cause of action against anyone who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or federal law. *See* 42 U.S.C. § 1983; *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Thus, to prevail on a claim under Section 1983, a plaintiff must establish that (1) the defendants acted under color of state law (that is, they were state actors) and (2) the challenged actions caused the plaintiff to be deprived of a federal right. *See West v. Atkins*, 487 U.S. 42, 48-49 (1988).

## I.    State Action

A threshold inquiry in any Section 1983 case is whether the defendant acted "under color of state law." *Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 367 (E.D.N.Y. 2011)

10

("*Estervine I*")*; see also Kia P. v. McIntyre*, 235 F.3d 749, 755 (2d Cir. 2000). Since relief under the statute is limited to those deprived of their rights by state actors, Section 1983 generally does not confer federal subject matter jurisdiction over claims challenging the actions of private parties. *See Kia P.*, 235 F.3d at 757. However, private conduct may constitute state action within the meaning of Section 1983 if the conduct is so "entwined with governmental policies" or "impregnated with a governmental character" that it becomes attributable to the state. *Id*.

In *Kia P. v. McIntyre,* the Second Circuit set forth the test for determining whether private medical providers who examine a child suspected to be the victim of abuse engage in state action. The Second Circuit held that private medical providers do not engage in state action when they examine children subject to active child abuse investigations unless the sole purpose of the providers' actions is to further the government investigation. *See Kia P.*, 235 F.3d at 756. There is no state action as long as the provider's actions are medically necessary, even if the examination is partially motivated by concerns about child abuse or other investigatory purposes. *See id*.; *V.S. v. Muhammad*, No. 07-CV-0213 (CBA) (JO), 2011 WL 4434216, at *8, *14 (E.D.N.Y. Sept. 22, 2011) (holding on a motion for summary judgment that (i) a private hospital was not a state actor during a period when it provided an infant with medical care and follow-up testing to determine whether the infant's injuries were consistent with shaken baby syndrome because the evidence, even viewed in the light most favorable to the plaintiffs, did not support a conclusion that the child was held solely for government investigatory purposes during that period, and (ii) the doctors who ordered screening tests were not state actors because the evidence reflected that reasonable doctors would have ordered those tests without regard to ACS involvement).

11

Conversely, private doctors become state actors when they engage in unnecessary medical examinations at the behest of government employees for purposes of investigating abuse as opposed to for diagnosis or treatment. *See Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, No. 98-CV-2416 (SJ), 2002 WL 13222, at *5 (E.D.N.Y. Jan. 3, 2002) (denying summary judgment against the plaintiff and concluding that there was a triable issue of fact as to whether the defendants were state actors where the private hospital personnel had examined the minor plaintiff "at the request of the police" to determine whether she had recently given birth and not for any medical purpose); *Estiverne I,* 833 F. Supp. 2d at 364, 368 (explaining on a motion for summary judgment that physician-ordered medical examinations are presumed to be medically necessary, even when performed with mixed investigative and medical motives, but holding that the plaintiffs had raised a genuine issue of material fact as to whether the private hospital defendants were acting under color of state law based on evidence that a treating physician had collaborated with ACS to subject the infant plaintiff to a battery of tests for the sole purpose of investigating abuse).

In *Kia P. v. McIntyre,* a mother sued on behalf of herself and her infant daughter, seeking to hold a private hospital liable under Section 1983 for detaining the child after the child's urine tested positive for methadone. *See Kia P.,* 235 F.3d at 752. Pursuant to hospital policy and state law, the hospital reported the positive test to the predecessor of ACS, the New York City Child Welfare Administration ("CWA"), and the infant was held for observation. *See id* at 752-53. The infant was medically cleared ten days later, but the hospital refused to discharge her for another two days pending CWA's approval. *See id.* at 753. The district court granted the private hospital defendant's motion for summary judgment and dismissed the complaint in its entirety, holding that the hospital was not a state actor and, regardless, did not violate the

plaintiffs' constitutional rights. *Id.* at 754. The Second Circuit affirmed, declining to assess whether the hospital had deprived the plaintiffs of any constitutional rights during the initial ten-day period of the infant's hospitalization and holding that the hospital was not a state actor while it kept the infant for purposes of treatment and observation. *See id.* at 757.

Even though the initial hospitalization was partially motivated by the hospital's desire to aid CWA's investigation, the Second Circuit reasoned that a hospital holding a child "as both a private actor and a state actor" is nonetheless "incapable of depriving . . . [the plaintiffs] of liberties that had already been taken away" by the hospital's private physicians acting for medical purposes. *Id.* However, the Second Circuit concluded that the private hospital became a state actor when it continued to detain the infant for two days after she was medically cleared for discharge based on hospital and CWA policies requiring that "any child under investigation by CWA not be released from the Hospital without CWA permission." *Id*. at 752-53, 756-57 (finding that the hospital was a state actor for the two-day period after the infant no longer needed hospitalization for any medical reason, because the hospital acted for the sole purpose of aiding the investigation of child abuse); *see also V.S.,* 2011 WL 4434216, at *8 (finding that a hospital became a state actor when it declined to discharge an infant after the child was medically cleared for release).

Whether a private hospital or doctor who is seeing a child brought in by ACS is a state actor is generally a fact-sensitive inquiry that turns upon the "reality of whether the hospital is no longer providing medical care and is solely acting as part of the machinery of the state." *Walston v. City of New York*, No. 22-CV-1002 (LAK) (JW), 2024 WL 1376905, at *7 (S.D.N.Y. 2024) (finding on a motion to dismiss that the private hospital's policy of detaining children

13

after they were medically cleared for discharge pending ACS investigations was sufficient to plead state action for purposes of a Section 1983 claim).

However, it is appropriate to grant summary judgment in favor of a private doctor based on a lack of state action when there is no evidence indicating that the doctor's actions were medically unnecessary, because even if the doctor's motives were mixed, a private physician does not become a state actor if there is any medical reason for her actions. *See, e.g., Kia P.*, 235 F.3d at 757; *V.S.*, 2011 WL 4434216, at *8, *14.

## II.    Fourth Amendment Violations

The Fourth Amendment is implicated when medical examinations are undertaken at the initiative of a state official for an investigatory purpose. *See Tenenbaum v. Williams*, 193 F.3d 581, 606 (2d Cir. 1999) (holding that the Fourth Amendment applies to "searches and seizures," including medical examinations, "made in the course of child abuse investigations"). Investigative medical examinations conducted without parental consent or judicial authorization violate the Constitution unless "reasonable or probable cause or exigent circumstances justifying an emergency examination" existed at the time the examination was performed. *Id.*; *see also van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 867-68 (2d Cir. 1990) (upholding the trial court's grant of summary judgment against the plaintiffs, reasoning that even though government actors violate the Constitution when they subject children to medically unnecessary x-rays without a court order, parental consent, or probable cause, the defendants were entitled to qualified immunity).

### III.    Fourteenth Amendment Violations

The Due Process Clause of the Fourteenth Amendment provides that "no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. Parents possess a liberty interest in the "care, custody, and management of their children," and this liberty interest is violated when children are subjected to non-emergency medical examinations absent consent or adequate procedural safeguards. *Tenenbaum*, 193 F.3d at 593 (citing  *Santosky v. Kramer,* 455 U.S. 745, 753 (1982)); *see also van Emrik,* 911 F.2d at 867; *L.B. v. City of N.Y.*, No. 23-CV-8501 (RPK) (JRC), 2025 WL 788662, at *7 (E.D.N.Y. Mar. 12, 2025) (denying in part a motion to dismiss Section 1983 claims where the ACS workers personally performed physical examinations on the infant plaintiff without parental consent or a court order).

### ANALYSIS

Plaintiffs allege that Drs. Goradia and Bralow (1) violated O.S.'s Fourth Amendment right to be free from unreasonable searches and seizures when they examined his body for injuries stemming from the alleged abuse; and (2) violated McInnis' Fourteenth Amendment right to procedural due process by subjecting her child to medical examinations without her consent. (*See* ECF 1, Compl. ¶¶ 144-86.) Drs. Goradia and Bralow seek summary judgment in their favor on both claims on the grounds that (1) they acted as private physicians and not state actors when they examined O.S. and (2) they did not deprive Plaintiffs of any constitutional or other federal rights. (*See* ECF 140-31, Defs.' Mem. at 6.)

Drs. Goradia and Bralow bear the burden of demonstrating that the record negates or contains insufficient facts to establish one or more essential elements of Plaintiffs' claims. I first

address whether Drs. Goradia and Bralow have carried that burden in connection with Plaintiffs' contention that Drs. Goradia and Bralow were state actors. If Drs. Goradia and Bralow have come forward with evidence that negates a conclusion that they were state actors, the burden would shift to Plaintiffs to point to evidence showing that there is a genuine issue of material fact as to whether Drs. Goradia and Bralow were functioning as state actors. *See V.S.*, 2011 WL 4434216, at *6.

As set forth below, even viewing the facts in the light most favorable to Plaintiffs, no reasonable factfinder could conclude that Drs. Goradia and Bralow were state actors when they examined O.S. Accordingly, I respectfully recommend that Your Honor should GRANT the pending motion for summary judgment against Plaintiffs.

**I.     Evidence that the Examinations of O.S. by
        Drs. Goradia and Bralow Were Medically Necessary**

After *Kia P.,* the question whether a private medical professional was functioning as a state actor when she examined a child under investigation for possible abuse is answered by determining whether the challenged actions were medically justified or, instead, were solely for the purpose of furthering the government investigation. *See, e.g., Estiverne I,* 833 F. Supp. 2d at 368. Drs. Goradia and Bralow argue that the unrebutted record evidence shows that their examination of O.S. was medically necessary under the circumstances. (*See* ECF 140-31, Defs.' Mem. at 8-11.) They point to evidence that:

- Following a triage examination, Nurse Beepot assessed O.S. at an urgent level three, which indicates that a patient is not presently experiencing an emergency but "should be seen as soon as a doctor is available." (ECF 140-30, Defs.' SUMF ¶¶ 21-22; ECF 142, Pls.' CSUMF ¶¶ 21-22.)

- Drs. Goradia and Bralow each testified that she examined O.S. to determine whether he had life-threatening injuries after he was brought to the SBH emergency room by ambulance,

16

complaining of having been beaten by his adult brother, bearing a visible bruise on his neck, and complaining of a headache, arm pain, and leg pain. (ECF 140-30 Defs.' SUMF ¶¶ 38, 40; ECF 142, Pls.' CSUMF ¶¶ 38, 40.) In particular, Dr. Goradia stated in her affidavit that, due to O.S.'s visible bruising and claims of assault, she could not conclude that O.S. was medically cleared for discharge based on the triage report alone and had to examine O.S. for hidden injuries to the airway, blood vessels, and head, which could not be detected by a layperson's visual inspection alone. (*See* ECF 140-20, Aff. of Rutmi Goradia in Supp. of Mot. For Summ. J. ¶¶ 4, 5, 11; *see also* 140-30, Defs.' SUMF ¶ 88; ECF 142, Pls.' CSUMF ¶ 88.)

- O.S. was discharged to his mother within minutes after Drs. Goradia and Bralow ruled out any life-threatening injuries. (*See* ECF 140-30, Defs.' SUMF ¶¶ 44-48; ECF 142, Pls.' CSUMF ¶¶ 44-48.)

Drs. Goradia and Bralow argue that this evidence supports a conclusion that their examinations of O.S. were medically necessary, which would negate a finding that the doctors were state actors. (*See* ECF 140-31, Defs.' Mem. at 10-11.)

## II.    Plaintiffs' Arguments that Drs. Goradia and Bralow Have Failed To Demonstrate that Their Examinations of O.S. Were Medically Necessary

Plaintiffs contend that Drs. Goradia and Bralow have failed to negate a conclusion that the doctors were state actors because the doctors' testimony (both at deposition and in affidavits) is self-serving and unsupported by the record and therefore not credible. (*See* ECF 141, Pls.' Mem. at 15, 17.) Plaintiffs go on to contend that the doctors' affidavits and deposition testimony are inadmissible because Drs. Goradia and Bralow (1) offer improper expert opinion testimony, (2) provide improper opinions on the ultimate legal question whether the examinations were medically necessary, and (3) offer opinions about the law regarding the doctors' understanding of their obligations under the Emergency Medical Treatment and Labor Act ("EMTALA"). (*See id.* at 15-16; ECF 142, Pls.' CSUMF ¶ 82.)[7]

---

[7]    Drs. Goradia and Bralow argue in the alternative that they were not state actors because they are obligated under EMTALA, 42 U.S.C. § 1395dd, to provide all patients an appropriate screening examination for emergency medical conditions. (*See* ECF 140-31, Defs.'

17

Plaintiffs do not create a disputed issue of material fact by arguing that Drs. Goradia and Bralow are interested parties whose testimony could be rejected by the factfinders. In opposing a motion for summary judgment, the nonmoving party must set forth specific facts showing a genuine dispute for trial rather than rely on conclusory statements discrediting the "uncontradicted and unimpeached testimony" of interested parties. *Chiaramonte*, 677 F. App'x. at 692 (citing *Anderson,* 477 U.S. at 248). "That an interested witness has testified regarding a certain issue . . . does not in and of itself raise a genuine issue of material fact." *Chiaramonte*, 677 F. App'x. at 692 (holding that the trial court had properly relied on "uncontradicted and unimpeached testimony" of an "interested witness" in granting a summary judgment motion).

Plaintiffs' disagreement with the medical judgments of Drs. Goradia and Bralow is also insufficient to create a disputed issue of material fact. *See Schwimmer v. Kaladjian*, 988 F. Supp. 631, 642 & n.4 (S.D.N.Y. 1997) (holding that one doctor's view that challenged x-rays were unnecessary did not create a material issue of fact as to whether the doctors who ordered the tests acted for any reason other than that they believed the x-rays were medically indicated), *aff'd,* 164 F.3d 619 (2d Cir. 1998); *Chayo v. Kaladjian*, 844 F. Supp. 163, 169-70 (S.D.N.Y. 1994) (rejecting the plaintiffs' argument that, notwithstanding a non-party treating physician's sworn statement that he ordered challenged x-rays to facilitate diagnosis and treatment, the x-rays were not medically necessary because they were duplicative, and concluding that the plaintiffs had no basis to challenge the treating physicians' medical judgment).

---

Mem. at 13-14.) I do not address this argument, because I conclude on other grounds that Drs. Goradia and Bralow have shown that no reasonable factfinder could conclude that they were state actors and because the doctors have cited no case law suggesting that a doctor's obligations under EMTALA are relevant to whether she engaged in state action under *Kia P.*

18

Nor do Plaintiffs' objections to the admissibility of testimony by Drs. Goradia and Bralow about their reasons for examining O.S. create an issue of material fact. Courts in this District have relied on similar testimony from treating physicians when deciding summary judgment motions in cases challenging nonconsensual physical examinations following allegations of child abuse.

For example, in *Schwimmer v. Kaladjian,* this Court denied the plaintiffs' motion to strike the treating physician's affidavit, rejecting the plaintiffs' arguments that the supervising doctor's testimony was not based on personal knowledge and reflected an inadmissible expert opinion. *See* 988 F. Supp. at 642. The Court concluded that a non-party doctor's position as the supervising physician responsible for the child plaintiff's care satisfied the personal knowledge requirement of Rule 56, even though the doctor did not recall personally examining the child and based his testimony on his review of hospital records. *See id.* The Court also held that the doctor did not offer expert medical opinion testimony but rather discussed his personal belief as a treating physician about the need for the challenged x-rays; as the Court explained, his testimony was provided to demonstrate that he and his staff had believed the x-rays were required for diagnosis and treatment and not to prove that they were correct in that belief. *See id*.

Drs. Goradia and Bralow examined O.S.; their motivations for doing so are within their personal knowledge as O.S.'s treating physicians and thus are an appropriate subject of testimony on which the Court may rely in making the legal determination whether their examinations of O.S. were medically necessary. *See id*. As was the case with the testimony of the non-party treating physician in *Schwimmer,* the testimony of Drs. Goradia and Bralow about their reasons for examining O.S. is permissible evidence of their personal beliefs about what

steps were required to diagnose O.S.; their testimony is not offered to prove that they were correct in their assessment that they needed to examine O.S. to rule out serious occult injuries. Nor do they opine whether, as a matter of law, their examinations were medically necessary, which encompasses one of the ultimate legal issues on this motion for summary judgment; the doctors' testimony provides evidence on which the Court may base its determination whether any reasonable factfinder could conclude that the doctors' examinations of O.S. were medically unnecessary.

Accordingly, the testimony of Drs. Goradia and Bralow that they examined O.S. to rule out hidden injuries is credible and admissible and therefore sufficient to negate a conclusion that the doctors were state actors.

III.    **Plaintiffs' Evidence that the Examinations of O.S.
By Drs. Goradia and Bralow Were Not Medically Necessary**

Because Drs. Goradia and Bralow provided evidence negating a conclusion that they were state actors, the burden shifted to Plaintiffs to identify affirmative evidence that the examinations were medically unnecessary, which would create a genuine issue of material fact as to whether the doctors were state actors. *See Chiaramonte*, 677 F. App'x at 694. Plaintiffs have failed to carry that burden.

A.    Evidence that O.S.'s Examinations Could Have Waited for McInnis' Arrival at SBH

Plaintiffs' argument that there is circumstantial evidence that there was no medical need to examine O.S. before his mother arrived to provide consent (*see* ECF 141, Pls.' Mem. at 21-23) fails to create a genuine issue of material fact. Plaintiffs point out that O.S. had no visible injuries other than superficial marks on the neck; his vital signs were normal; he appeared playful; the triage nurse assigned him a triage acuity level of three, which indicated that O.S.

20

was not actively experiencing a medical emergency; he waited to see a doctor for over three hours after arriving at SBH without any adverse consequences; and neither physician ultimately provided any medical treatment. (*See id.* at 20; ECF 143, Pls.' CSUMF ¶¶ 14-15, 87, 95-99, 101.) Based on this evidence that O.S. was not in immediate medical distress when he was examined by Drs. Goradia and Bralow, Plaintiffs conclude that there was "reasonable time consistent with the safety of the child to obtain" McInnis' consent before examining O.S. (ECF 141, Pls.' Mem. at 18.)

Plaintiffs' position conflates the test for determining if a private doctor functioned as a state actor – whether the doctor's challenged behavior was solely for government purposes or whether there was some medically necessity, *see Kia P.*, 235 F.3d at 757 – with the test for assessing if a medical examination by a state actor conducted without judicial authorization, parental consent, or probable cause violated a child's Fourth Amendment rights – whether "exigent circumstances justif[ied] an emergency examination," *Tenenbaum*, 193 F.3d at 606. That O.S. was not suffering from visibly life-threatening injuries does not support the conclusion that Drs. Goradia and Bralow examined him for ACS-related purposes, let alone solely for ACS-related purposes. *See V.S.*, 2011 WL 4434216, at *8 (holding that keeping a child in the hospital after he was declared "stable and ready for release" by one physician did not mean that the child was being held "solely for ACS-related purposes" when the child was being seen by other doctors and there was no evidence that the detention was for reasons other than a "medical judgment that [the child] warranted in-patient care" ); *see also Kia P.*, 235 F.3d at 756 n.2 (finding insufficient evidence to conclude that the decision to hold the infant plaintiff until she was medically cleared was made for "CWA-related purposes and therefore constituted government action").

21

Under *Kia P* and its progeny, a private doctor's testing and examination to determine whether a suspected victim of child abuse has hidden injuries – including injuries that do not require emergency treatment – do not convert the doctor into a state actor. *See Kia P.*, 235 F.3d at 756 (ruling that the hospital held the infant plaintiff for treatment and observation following suspected methadone poisoning "in its capacity as a private provider of medical care and thus d[id] not subject the Hospital to liability under § 1983"); *Estiverne v. Esernio-Jenssen*, 910 F. Supp. 2d 434, 443-44 (E.D.N.Y. 2012) ("*Estiverne II*") (entering judgment against the plaintiff parents after a bench trial, finding that the challenged medical tests did not constitute state action because "[w]hether or not the doctors had suspicions of additional injuries arising from their suspicions of abuse . . .[,] the tests were necessary to determine whether [the child] needed any further medical treatment," so that the treating physician's "cooperation in the ACS investigation, by providing medical information and opinion, [did] not transform her into a state actor"); *V.S.*, 2011 WL 4434216, at *14 (granting summary judgment against the plaintiffs on their claims against private hospital defendants and concluding that the defendants did not become not state actors as a result of the testing they ordered for injuries consistent with child abuse after the child plaintiff's femur fracture had been stabilized because the testing was medically indicated).

Nor does the outcome – a determination that O.S. did not require treatment – provide evidence that Drs. Goradia and Bralow examined O.S. solely to support the ACS child abuse investigation. Plaintiffs have cited no caselaw, and I have not located any, holding that whether a private medical professional was a state actor is decided in hindsight based on whether the child who was examined ended up needing treatment. Plaintiffs have failed to proffer any

22

evidence countering the evidence that Drs. Goradia and Bralow examined O.S. to rule out any hidden injuries.

      B.      <u>Evidence that Drs. Goradia and Bralow Were Working with ACS</u>

Plaintiffs' argument that it was "readily apparent" that Drs. Goradia and Bralow were "working hand in hand with ACS" is also insufficient to create a genuine issue of material fact. Plaintiffs point to evidence that Drs. Goradia and Bralow examined O.S. at the request of government actors, which Plaintiffs correctly note could create a strong presumption of state action. (ECF 141, Pls.' Opp. at 18.) *See also Armstrong*, 2002 WL 13222, at *5 (E.D.N.Y. Jan. 3, 2002) (denying summary judgment in favor of the defendants and concluding that there was a triable issue of fact as to whether the defendants were state actors, because the private hospital defendants had examined the minor plaintiff "at the request of the police" to determine whether she had recently given birth and not for any medical purpose); *McLoughlin v. Rensselaer Cnty. Dep't of Soc. Servs.*, No. 18-CV-0487 (LEK) (CFH), 2019 WL 3816882, at *8 (N.D.N.Y. Aug. 14, 2019) (holding on a motion to dismiss that "when an examination is brought at the request of an investigating social worker rather than a doctor, it is at least plausible that the motive was to investigate child abuse").

In support of a conclusion that SBH colluded with ACS and that Drs. Goradia and Bralow examined O.S. at the request of government actors, Plaintiffs highlight that:

- FDNY personnel brought O.S to the hospital, and Pray, who was known by Drs. Goradia and Bralow to be an ACS worker, ushered O.S. through the triage and examination process and described O.S.'s complaints to the doctors. (*See* ECF 142, Pls.' CSUMF ¶¶ 16, 30, 32.)

- Pray testified that she and her supervisor believed that a medical assessment was necessary to determine whether O.S. had injuries consistent with the alleged assault. (*See id.* ¶¶ 76-77.)

- Dr. Goradia stated in her affidavit that SBH "reserve[d] the right" to examine children without parental consent when handling cases of suspected child abuse, especially when the child was accompanied to the hospital by an ACS caseworker. (*See id.* ¶¶ 87, 127.)

- SBH has an elopement precaution protocol under which children who come to the hospital with ACS caseworkers are given distinctive yellow hospital gowns and placed under continuous staff supervision. (*See id.* ¶¶ 23, 100.)

But evidence that Drs. Goradia and Bralow examined O.S. at the request of the state is beside the point in light of the evidence that the examinations served a medical purpose: a private doctor does not become a state actor by examining or testing a child at the request of the state, as long as the doctor's actions are medically indicated. *See, e.g., Kia P.,* 235 F.3d at 756-7; *van Emrik*, 911 F.2d at 867. Put another way, a medical examination is considered medically necessary for purposes of determining whether a private doctor was functioning as a state actor even when the exam was performed with mixed investigative and medical motives, as long as there was some medical need for the exam. *See Estiverne I,* 833 F. Supp. 2d at 368. Drs. Goradia and Bralow's awareness of ACS's interest in investigating possible child abuse does not mean that their examinations were medically unnecessary. *See V.S.*, 2011 WL 4434216, at *14 ("[T]he fact that private doctors . . . know that ACS will be interested in, and may act upon, [medical test] results (insofar as they confirm or rule out child abuse) [does not mean] that the Constitution regulates those private doctors' decisions.").

****

Drs. Goradia and Bralow have submitted evidence that their examinations of O.S. were medically necessary. Plaintiffs have not proffered any evidence contradicting the testimony by Drs. Goradia and Bralow that they examined O.S. to rule out hidden injuries, and so no reasonable factfinder could conclude that the examinations were not medically necessary, even

24

when viewing the evidence in the light most favorable to Plaintiffs. Thus, even if ACS requested the exams, no reasonable factfinder could conclude that Drs. Goradia and Bralow functioned as state actors when they examined O.S., meaning that Plaintiffs' claims against Drs. Goradia and Bralow should be dismissed.

In the event that Your Honor disagrees with my recommendation that the summary judgment should be granted against Plaintiffs because no reasonable factfinder could conclude that Drs. Goradia and Bralow were state actors, I respectfully request that Your Honor remit the summary judgment motion to me for further consideration.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that Your Honor should GRANT the pending motion for summary judgment (ECF 140) against Plaintiffs.

DATED:  December 19, 2025
    New York, NY

Respectfully Submitted,

**ROBYN F. TARNOFSKY**
United States Magistrate Judge

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION**

The parties shall have fourteen days (including weekends and holidays) from service of this report and recommendation to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy.

*See* Fed. R. Civ. P. 72(b)(2). Such objections, and any responses to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections or responses to objections must be addressed to Judge Woods.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 152 (1985).